954 F.2d 847
 13 ITRD 2240, 60 USLW 2503, 1992
Copr.L.Dec. P 26,870,
21 U.S.P.Q.2d 1673
 NEW YORK CHINESE TV PROGRAMS, INC., Plaintiff-Appellee,
v.
U.E. ENTERPRISES, INC., Flushing Star, Inc., Chan's Video &
Trading, Inc., Gong Pictures, Inc., Dang's Video,
Inc., Po Yuen, Defendants-Appellants,
Queens Video Ltd., John Does 1-50, Defendants.
 No. 544, Docket 91-7694.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 21, 1991.
Decided Jan. 24, 1992.
 
 Po W. Yuen, New York City (Stephen Gleit, of counsel), for defendants-appellants.
 Howard A. Wintner, New York City, (Berger, Steingut, Tarnoff & Stern, of counsel), for plaintiff-appellee.
 Before PRATT, MAHONEY and McLAUGHLIN, Circuit Judges.
 McLAUGHLIN, Circuit Judge:
 
 
 1
 There are six defendants-appellants: U.E. Enterprises, Inc. ("U.E."); Flushing Star, Inc. ("Flushing Star"); Chan's Video & Trading, Inc. ("Chan's"); Gong Pictures, Inc. ("Gong"); Dang's Video, Inc. ("Dang"); and Po Yuen ("Yuen"). They seek to review a judgment of the United States District Court for the Southern District of New York (Kathleen A. Roberts, U.S. Magistrate Judge ), finding the six defendants liable for copyright infringement. For the reasons set forth below, we affirm the judgment of the district court.
 
 BACKGROUND
 
 2
 Three television stations in Taiwan (the "Taiwanese Stations") produce Mandarin language[1] soap operas (the "Programs"). These Programs are popular among the twenty million people who live on the island of Taiwan.
 
 
 3
 There are also many Mandarin speaking people in the United States. To tap this American market for Mandarin soap operas, the International Audio Visual Corporation ("IAVC"), a California corporation, contracted with the Taiwanese Stations in 1982 for the right to sell video cassette copies of the Programs in the United States. The Taiwanese Stations also assigned to IAVC the right to obtain American copyrights for the Programs. Shortly after signing this agreement, IAVC registered the Programs for copyright protection with the United States Copyright Office.
 
 
 4
 In April, 1988, IAVC signed an agreement with plaintiff New York Chinese TV Programs, Inc. ("New York Chinese"). This agreement granted New York Chinese the exclusive license to distribute video cassette copies of the Programs in New York and New Jersey. The agreement also assigned to New York Chinese the right to sue to protect IAVC's copyrights in the Programs throughout New York and New Jersey.
 
 
 5
 The present controversy arises out of the defendants' attempts to sell the same Programs in the New York-New Jersey area. Operatives of defendants Dang and U.E. videotaped the Programs as they were broadcast in Taiwan, and then imported these tapes surreptitiously into the United States in boxes labelled "Gift." Dang and U.E. later made numerous copies of the tapes, and distributed them to store-front video retail stores operated by U.E. in the New York metropolitan area, including defendants Flushing Star, Chan's, and Gong.
 
 
 6
 New York Chinese eventually discovered that defendants' stores were renting out illicit videotapes of the Programs. Of course, none of the stores had obtained valid sub-licenses from New York Chinese to do this. New York Chinese filed suit against U.E., Dang, Flushing Star, Chan's, Gong, and Mr. Yuen (the president of both U.E. and Dang) alleging copyright infringement, and requesting damages and a permanent injunction to prevent defendants from further copying or marketing the Programs.
 
 
 7
 Then-District Judge Walker issued a temporary restraining order on June 17, 1988, prohibiting defendants from copying, distributing, renting, or selling any copies of the Programs. He then assigned the case to Magistrate Judge Kathleen A. Roberts for all purposes, pursuant to 28 U.S.C. § 636(c),[2] and she subsequently bifurcated the liability and damage issues for trial.
 
 
 8
 On the liability issue, the parties submitted a stipulation of facts for determination. The district court concluded that defendants had infringed the copyrights on the Programs, and permanently enjoined defendants from copying, distributing, selling, renting or otherwise marketing any copies of the Programs.
 
 
 9
 The district court then held a trial to determine damages, and awarded New York Chinese actual damages of $718,707.85, or, alternatively, statutory damages of $762,500.[3] New York Chinese opted to receive statutory damages, and a final judgment awarding such damages, plus attorney's fees, was entered on July 5, 1991.
 
 
 10
 The parties later stipulated to reduce the damages, but defendants have appealed the district court's determination that they are liable for copyright infringement. Accordingly, the sole issue we must address is whether there has been a copyright infringement.
 
 DISCUSSION
 
 11
 To establish a claim for copyright infringement, the plaintiff must (1) possess a valid copyright in a given work, and (2) show that the defendant has copied the work. Eckes v. Card Prices Update, 736 F.2d 859, 861 (2d Cir.1984). Defendants concede that New York Chinese has satisfied the second prong of the Eckes test, but focus their attack on the first prong. Specifically, they challenge the district court's ruling that the Programs are eligible for copyright protection under Section 104(b)(1) of the Copyright Act of 1978, codified at 17 U.S.C. § 104(b)(1). We disagree, and affirm the conclusion of the district court.
 
 
 12
 Section 104(b)(1) makes an original work eligible for copyright protection if
 
 
 13
 on the date of first publication, one or more of the authors is a national or domiciliary of the United States, or is a national, domiciliary, or sovereign authority of a foreign nation that is a party to a copyright treaty to which the United States is also a party.
 
 
 14
 Defendants do not question that the "authors" of the Programs are the Taiwanese Stations, which are Taiwanese nationals. The sole question, then, is whether Taiwan has a copyright treaty with the United States. The answer to this question requires some understanding of the evolution of Taiwan's place in the world community.
 
 
 15
 From 1661 through 1895, the imperial dynasty that ruled mainland China also controlled the island of Taiwan. In 1895, following its defeat in the first Sino-Japanese War, the Chinese monarchy ceded control of Taiwan to Japan in the Treaty of Shimomoseki. After the collapse of the Chinese monarchy in 1912, a new government--the Republic of China ("ROC")--was established to rule over China.
 
 
 16
 Shortly after the bombing of Pearl Harbor in December 1941, the ROC declared war on Japan. At that time, the ROC renounced the Treaty of Shimomoseki, and reasserted its claim to sovereignty over Taiwan. However, Taiwan remained under Japanese control until Japan surrendered to the Allied powers, and accepted the Potsdam Declaration on September 2, 1945. The Potsdam Declaration explicitly stated that Taiwan would return to Chinese rule. Thus, the post-World War II ROC included both mainland China and the island of Taiwan.
 
 
 17
 As the post-war Republic of China sought to enhance its stature in the world, it set out to forge an especially strong economic relationship with the United States. To do this, the ROC signed the Treaty of Friendship, Commerce and Navigation ("FCN Treaty") with the United States in 1946. The FCN Treaty was then ratified by the United States Senate in June, 1948, and took effect on November 30, 1948. See Treaty of Friendship, Commerce and Navigation, Nov. 4, 1946, U.S.-Taiwan, 63 Stat. 1299 (1946). The FCN Treaty lies at the core of the present controversy. Of paramount importance is Article IX, which requires both the ROC and the United States to guarantee the privileges of their own laws to citizens of the other nation
 
 
 18
 in regard to copyrights, patents, trademarks, trade names, and other literary, artistic and industrial property, upon compliance with the applicable laws and regulations, if any, respecting registration and other formalities which are or may hereafter be enforced by the duly constituted authorities ...
 
 
 19
 63 Stat. at 1309. Thus, the FCN Treaty empowers the United States to grant copyright protection to works authored by Taiwanese citizens.
 
 
 20
 Before the ROC could enjoy the fruits of the FCN Treaty, however, civil war broke out in China between Chiang Kai-Shek's ROC army, and communist revolutionaries led by Mao Zedong. The communists ultimately defeated the ROC army in 1949, and established a government called the People's Republic of China ("PRC"). Approximately two million ROC loyalists fled to Taiwan, and have retained control of that island to this day.
 
 
 21
 The United States declined to establish diplomatic relations with the communist PRC, and continued instead to recognize the ROC as the sole government of China and Taiwan. The United States continued to honor all its agreements with the ROC, which, in effect, meant with Taiwan because, in reality, the ROC controlled only that area. Thus, because the United States had honored the FCN treaty prior to the Chinese revolution, it continued to abide by that treaty's terms in its dealings with Taiwan.
 
 
 22
 By the 1970's, it had become impossible for the international community to ignore the reality of the PRC, a nation of nearly one billion people. In 1971, the United Nations ordered that China's U.N. seat be taken from the ROC, and given to the PRC. This fueled efforts within the United States to give diplomatic recognition to the PRC, culminating with the United States establishing full diplomatic relations with the PRC on January 1, 1979.
 
 
 23
 Recognition of the PRC, of course, enveloped the ROC in a diplomatic fog. Neither the PRC nor the ROC asserted that they were two separate countries. Because both the PRC and the ROC professed to be the one true "China," the United States could not pretend that both governments had sovereignty over all of China. Recognition of the PRC, therefore, necessitated derecognition of the ROC. Accordingly, on December 30, 1978, then-President Jimmy Carter signed a memorandum "recognizing the government of the People's Republic of China as the sole legal government of China and ... terminating diplomatic relations with the Republic of China." President's Memorandum for All Departments and Agencies: Relations With the People of Taiwan, reprinted in 1979 U.S.Code Cong. & Admin.News 36, 75 (hereinafter President's Memorandum ).
 
 
 24
 The President's Memorandum acknowledged that, despite its termination of diplomatic relations with Taiwan, the United States still wished to maintain "commercial cultural, and other relations with the people of Taiwan without official government representation and without diplomatic relations." Id. As part of this policy, the President's Memorandum directed that
 
 
 25
 Existing international agreements and arrangements in force between the United States and Taiwan shall continue in force and shall be performed and enforced by departments and agencies beginning January 1, 1979, in accordance with their terms and, as appropriate, through that instrumentality.
 
 
 26
 Id.
 
 
 27
 Since 1979, the Executive Branch has consistently used the President's Memorandum 's mandate as a basis for continuing to honor the FCN Treaty. The State Department annually publishes Treaties in Force, listing all treaties that are honored by the United States. Significantly, each edition of Treaties in Force published since the United States derecognized Taiwan in 1979 includes the FCN Treaty as a valid and enforceable treaty.
 
 
 28
 Derecognition of Taiwan prodded Congress to ensure that Taiwan's status as a major United States trading partner remained unscathed.[4] Accordingly, Congress passed the Taiwan Relations Act ("TRA") codified at 22 U.S.C. § 3301, et seq., "to preserve and promote extensive, close, and friendly commercial, cultural, and other relations between the people of the United States and the people on Taiwan" and to "declare that peace and stability in the area are in the political, security, and economic interests of the United States." 22 U.S.C. § 3301(b)(1), (2).
 
 
 29
 The substantive provisions of the TRA are analogous to the President's Memorandum. Like the President's Memorandum, the TRA states that the
 
 
 30
 absence of diplomatic relations or recognition shall not affect the application of the laws of the United States with respect to Taiwan ... in the [same] manner that the laws of the United States applied with respect to Taiwan prior to January 1, 1979.
 
 
 31
 22 U.S.C. § 3303(a). More specifically, the TRA mandates
 
 
 32
 the continuation in force of all treaties and other international agreements ... entered into by the United States and the governing authorities on Taiwan recognized by the United States as the Republic of China prior to January 1, 1979, and in force between them on December 31, 1978, unless and until terminated in accordance with law.
 
 
 33
 Id. § 3303(c).
 
 
 34
 That Congress intended to include the FCN Treaty within the "treaties in force" between the United States and Taiwan is beyond question. Indeed, the House of Representatives Report on the TRA explicitly stated Congress' intent to honor the FCN Treaty: "[T]he U.S.-ROC Treaty of Friendship, Commerce and Navigation, which provides a legal foundation for commercial relations between the United States and Taiwan, will continue without interruption." H.R.Rep. No. 26, 96th Cong., 1st Sess. 10-11 (1979).
 
 
 35
 Despite the overwhelming evidence of both the Executive and Legislative Branches' intent to give full effect to the FCN Treaty, defendants make two arguments that the United States no longer has a copyright treaty with Taiwan. First, defendants contend that because the TRA purported to require the United States to honor the obligations of the FCN Treaty, the TRA itself had to be a new "treaty" between the United States and Taiwan. But, the argument runs, the TRA was not made in accordance with Article II of the United States Constitution and, therefore, is not a valid "treaty." Defendants conclude that because the TRA is not a "treaty," the requirement of Section 104(b)(1) that there be a treaty has not been met. Second, defendants argue that even if the TRA does not have to meet the "treaty" requirement of Section 104(b)(1), the United States cannot constitutionally continue to honor the FCN Treaty. We reject both arguments.
 
 
 36
 1. The "Treaty" Requirement of Section 104(b)(1)
 
 
 37
 As noted previously, Section 104(b)(1) permits the granting of copyright protection to works authored by citizens of a foreign nation if that nation is a party to a copyright treaty with the United States. Defendants argue that the United States and Taiwan no longer have such a treaty. This conclusion rests on two premises. First, defendants contend that the FCN Treaty lapsed in 1979 when the United States derecognized Taiwan. Second, defendants assert that the TRA cannot resurrect the obligations imposed by the FCN Treaty because that would require a new treaty, and the TRA is not a treaty.
 
 
 38
 To be sure, the TRA is not a "treaty." A "treaty" is a contract between nations. Trans World Airlines v. Franklin Mint Corp., 466 U.S. 243, 253, 104 S.Ct. 1776, 1783, 80 L.Ed.2d 273 (1984). The TRA is solely a domestic statute. It was passed by both the House of Representatives and the Senate, and became law upon the signature of President Carter. The TRA did not require Taiwanese ratification. The TRA did not impose any obligations on Taiwan. Therefore, the TRA is not a contract between the United States and Taiwan, but rather is a statute that binds just the United States.
 
 
 39
 The difficulty with the defendants' argument lies in their root premise that the FCN Treaty lapsed upon derecognition of Taiwan. It is well settled that "on the question whether [a] treaty has ever been terminated, governmental action in respect to it must be regarded as of controlling importance." Terlinden v. Ames, 184 U.S. 270, 285, 22 S.Ct. 484, 490, 46 L.Ed. 534 (1902). Moreover, the judiciary should refrain from determining whether a treaty has lapsed, and instead should defer to the wishes of the elected branches of government. See Whitney v. Robertson, 124 U.S. 190, 194, 8 S.Ct. 456, 458, 31 L.Ed. 386 (1888). In this case, both Congress and the Executive Branch have, with rare clarity, determined that the United States must continue to honor the FCN Treaty, despite official diplomatic derecognition of Taiwan.
 
 
 40
 The TRA requires the United States to honor all previous treaties and international agreements with Taiwan. Among these obligations is the FCN Treaty, which was explicitly noted by the House of Representatives in its report on the TRA. H.R.Rep. No. 26, 96th Cong., 1st Sess. 10-11 (1979). Thus, we find that Congress indisputably intended that the FCN Treaty remain a valid and enforceable treaty.
 
 
 41
 Similarly, the Executive Branch has not wavered from honoring the FCN Treaty. Each edition of the State Department pamphlet Treaties in Force published between 1979 and the present date lists the FCN Treaty as a valid treaty. Moreover, we have not located any proclamation from either the President or any Executive Agency renouncing the United States' obligations under the FCN Treaty.
 
 
 42
 Because both Congress and the Executive Branch agree that the FCN treaty is to continue in effect, and because of the deference we owe to the political branches of the government in treaty matters, we hold that the FCN treaty remains a valid and enforceable treaty.
 
 
 43
 2. The Constitutionality of Honoring the FCN Treaty
 
 
 44
 Defendants contend that if the United States must continue to honor the FCN Treaty, such a course of action violates the constitutional mandate that the President "shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur." U.S. Const. art. II, § 2, cl. 2. Because a treaty is a contract between nations, see Trans World Airlines, 466 U.S. at 253, 104 S.Ct. at 1783, defendants argue that the United States' derecognition of Taiwan implies that Taiwan is no longer a "nation," and, thus, the United States cannot remain bound by any treaties with Taiwan. This argument is fatally flawed because it confuses two distinct concepts: nationhood and diplomatic recognition.
 
 
 45
 A "nation" is an entity with (1) a defined territory; (2) a permanent population; (3) a government; and (4) the ability to engage in relations with other nations. See, e.g., Hungdah Chiu, Certain Legal Aspects of Recognizing the People's Republic of China, 11 Case W.Res.J.Int'l L. 389, 395-96 (1979). "Diplomatic recognition," marked by an exchange of diplomats, is a formal acknowledgement by a nation that another entity possesses the qualifications for nationhood. An entity's status as a nation, however, does not depend on whether it receives diplomatic recognition from other nations. See Restatement (Third) of the Foreign Relations Law of the United States § 202 cmts. a, b (1987). Defendants have cited no authority, and we have found none, that bars treaties between sovereign nations that do not otherwise maintain diplomatic relations. There is no reason in logic or policy to require diplomatic recognition as a sine qua non to the treaty-making power. We hold, therefore, that the United States' derecognition of Taiwan did not change Taiwan's status as a nation. Because Taiwan is still a nation, the United States may continue to honor its treaties with Taiwan.
 
 
 46
 It is significant that Taiwan is not the only nation that has treaties with the United States despite the absence of diplomatic relations. Currently, the United States does not accord diplomatic recognition to nine nations:[5] Albania, Angola, Cambodia, Taiwan, Cuba, Iran, Libya, Vietnam, and North Korea. However, with the exception of Angola and North Korea, each of these nations has at least one treaty with the United States that is currently honored. See Treaties in Force, passim. Thus, our holding that diplomatic recognition is not a prerequisite for a valid treaty ensures that we do not thwart the ability of the United States to honor treaties with other nations.
 
 
 47
 Having failed to persuade us that the United States may not constitutionally honor treaties with unrecognized nations, defendants make one final argument: that the TRA has unconstitutionally amended the FCN Treaty. They focus their attack on section 4(c) of the TRA, which states:
 
 
 48
 For all purposes, including actions in any court in the United States, the Congress approves the continuation in force of all treaties and other international agreements ... entered into by the United States and the governing authorities on Taiwan recognized by the United States as the Republic of China prior to January 1, 1979, and in force between them on December 31, 1978, unless and until terminated in accordance with law.
 
 
 49
 22 U.S.C. § 3303(c) (emphasis added).
 
 
 50
 Defendants claim that because the FCN Treaty was signed by the "Republic of China," the TRA's approval of all agreements with the "governing authorities on Taiwan recognized by the United States as the Republic of China prior to January 1, 1979" changes one of the parties to the FCN Treaty. Because the TRA was not enacted pursuant to the Treaty Clause of the Constitution, defendants argue that the TRA is, therefore, an unconstitutional amendment to the FCN Treaty.
 
 
 51
 We do not quarrel with defendants' assertion that a significant amendment to a treaty must follow the mandate of the Treaty Clause, and therefore must be proposed by the President, and be ratified following the advice and consent of the Senate. We find, however, that the TRA has not amended the FCN Treaty in such fashion as to implicate the Treaty Clause.
 
 
 52
 The TRA simply inserted a new name in the FCN Treaty to replace the derecognized "Republic of China," and to recognize the realities of a changed political landscape. A change in the name of a party to a treaty is not an "amendment" to that treaty. Cf. Arnbjornsdottir-Mendler v. United States, 721 F.2d 679 (9th Cir.1983) (treaty between the United States and Denmark applied to Iceland after Iceland had declared its independence from Denmark). Rather, a treaty is "amended" only if the obligations imposed by that treaty change. The TRA certainly has not changed any of the substantive requirements of the FCN Treaty.
 
 
 53
 Finally, we are mindful of the strong commercial relationship ties between the United States and Taiwan. Indeed, Taiwan's trade with the United States has increased nearly four-fold since 1979.[6] This trade would surely go elsewhere if the FCN, the bedrock of the U.S.-Taiwanese commercial relationship, were to crumble suddenly. Taiwan, moreover, has unfailingly relied upon the FCN Treaty to provide protection of its own copyright laws to works authored by American citizens. Taiwan would have little reason to honor the FCN Treaty if the United States were to turn its back on the Treaty. Thus, our holding encourages the United States to provide copyright protection to works authored by Taiwanese citizens, and insures that Americans will receive copyright protection of their works in Taiwan.
 
 CONCLUSION
 
 54
 We hold that the FCN treaty is still in effect by virtue of both Congress' enactment of the TRA and the Executive Branch's position that the FCN has remained in effect, and that the actions of both of these branches do not violate the Constitution. The FCN is a valid "treaty" for purposes of Section 104(b)(1) of the Copyright Act. Accordingly, the district court correctly held that the Programs enjoy copyright protection, and defendants are liable for copyright infringement.
 
 
 55
 AFFIRMED.
 
 
 
 [1]
 Mandarin is the principal dialect of the Chinese language, and is the official language of China, Taiwan, and Singapore. See The Universal Almanac 545 (John W. Wright ed., 1989)
 
 
 [2]
 28 U.S.C. § 636(c)(1) provides, in pertinent part, "Upon the consent of the parties, a full-time United States [M]agistrate [Judge] ... may conduct any or all proceedings in a jury or nonjury civil matter...." In such situations, a non-prevailing party "may appeal directly to the appropriate United States court of appeals from the judgment of the [M]agistrate [Judge] in the same manner as an appeal from any other judgment of a district court." Id. § 636(c)(3). Thus, we have jurisdiction to review the judgment of Magistrate Judge Roberts
 
 
 [3]
 "Actual" damages include "damages suffered by [the copyright owner] as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." 17 U.S.C. § 504(b). "Statutory" damages are awarded by the trial court for each work that has been infringed "in a sum of not less than $500 or more than $20,000 as the court considers just." Id. § 504(c)(1). A copyright owner who prevails in a copyright infringement action may elect to recover either actual damages or statutory damages. Id
 
 
 [4]
 In 1979, Taiwan imported $3 billion of American-made products, making Taiwan the seventeenth largest importer of American goods. In the same period, Taiwan exported $5.6 billion of goods to the United States, ranking it the eighth largest exporter of goods to the United States. See Official Statistics of the United States Dep't of Commerce (1979)
 
 
 [5]
 This enumeration does not take into account the recent dissolution of the U.S.S.R. and the emergence of its constituent republics as independent nations
 
 
 [6]
 In 1990, Taiwan imported over $11 billion of American goods, and exported over $22 billion of its own goods to the United States. See Official Statistics of the United States Dep't of Commerce (1990)