Lui KIN–HONG, a/k/a Jerry Lui, Petitioner/Relator,

v.

The UNITED STATES of America, Respondent.

Civ. A. No. 96–10849–JLT.

United States District Court, D. Massachusetts.

Jan. 7, 1997.

As Corrected Jan. 9, 1997.

Andrew Good, Harvey A. Silverglate, Silverglate & Good, Boston, MA, for Lui Kin–Hong.

Alex Whiting, Susan C. Hanson–Philbrick, United States Attorney's Office, Michael Surgalla, United States Department of Justice, Office of International Affairs, Boston, MA, for United States.

Andrew Y. Au, Greenbelt, MD, for Alliance Of Hong Kong Chinese, Amicus Curiae.

Michael Posner, Lawyers' Committee for Human Rights, New York City, for Lawyers' Committee for Human Rights, Amicus Curiae.

John Reinstein, Civil Liberties Union of Massachusetts, Boston, MA, for American Civil Liberties Union of Massachusetts, Amicus Curiae.

## MEMORANDUM

TAURO, Chief Judge.

Before the court is a petition for a writ of *habeas corpus* seeking the unconditional release of Petitioner Lui Kin–Hong ("Lui"), who has been in the custody of the United States since his arrest in Boston on Decem-

ber 20, 1995. That arrest was precipitated by an extradition request of the United Kingdom on behalf of the Crown Colony of Hong Kong ("Hong Kong").

On August 29, 1996, Magistrate Judge Zachary Karol issued an opinion authorizing the surrender of Lui to Hong Kong. In response, Lui filed the pending petition.

## I.

### HISTORICAL BACKGROUND

The complex legal issues involved in this petition and the underlying extradition request must be examined in the context of the unique colonial relationship between the United Kingdom and Hong Kong. That relationship originated in 1898 when the United Kingdom leased the New Territories of Hong Kong from China for a term of ninety-nine years. Convention of Beijing, June 9, 1898, in 1 *Treaties and Agreements with and Concerning China,* 1894–1919, 130, No. 1898/11 (1921). The remaining Hong Kong territory was subsequently ceded to the United Kingdom. *See* Comment, *The Reversion of Hong Kong to China: Legal and Practical Questions,* 21 Willamette L.Rev. 327 (1985).

Accordingly, extradition to Hong Kong from the United States has been governed by the Extradition Treaty between the Government of the United States of America and the United Kingdom of Great Britain and Northern Ireland (the "Treaty"). U.S.-U.K., 28 U.S.T. 227, June 8, 1972. The reach of the Treaty was officially extended to Hong Kong by an exchange of notes in Washington, D.C. on October 21, 1976. The Treaty was subsequently modified by the Supplementary Treaty Concerning the Extradition Treaty Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland (the "Supplementary Treaty") on December 23, 1986. S. Treaty Doc.

No. 99–8, 99th Cong., 1st Sess., 132 Cong. Rec. 16557 (1986).[1]

Central to the issues underlying this petition are the facts that, on July 1, 1997, Hong Kong will revert to the sovereignty of the People's Republic of China ("China"),[2] and that the United States does not have an extradition treaty with China. *See* 18 U.S.C.A. § 3181 (West 1985 & Supp.1996) (listing countries with whom the United States has an extradition treaty).

## II.

### THE PETITIONER

Lui, a citizen of both Hong Kong and Canada, was employed by Brown & Williamson Tobacco Corporation ("B & W") from August 1988 to May 1993. B & W is a wholly-owned subsidiary of British–American Tobacco Industries PLC ("BAT PLC"). On January 1, 1992, Lui, while still employed by B & W, became Export Director at the British American Tobacco Corporation in Hong Kong ("BAT–HK"), also a wholly-owned subsidiary of BAT PLC. At the time, BAT–HK had exclusive rights to distribute cigarettes in several Asian countries, and Lui was allegedly responsible for allocating cigarettes to selected Hong Kong trading companies.

In its extradition request, the Crown Colony of Hong Kong claims that Lui, in conjunction with other BAT–HK executives, solicited and accepted bribes in excess of three million American dollars from one trading company in particular, Giant Island Ltd. ("GIL"), and certain GIL affiliates, namely Wing Wah Company ("Wing Wah") and Pasto Company Ltd. GIL allegedly paid the bribes to secure a monopoly over the export of BAT–HK cigarettes.

While Lui admits to having received the money, he contends that it was legitimate business income, paid to him in exchange for his assistance in establishing GIL's profitable trading relationships. In support of his posi-

---

1. All of the treaties relevant to this case have been reprinted in 2 *Extradition Laws and Treaties, United States* 920.1–920.30 (compiled by Igor I. Kavass & Adolf Sprudzs, 1980 & Rev. 6, 1989).

2. Hong Kong's sovereignty will change pursuant to the Joint Declaration of the Government of the

United Kingdom of Great Britain and Northern Ireland and the Government of the People's Republic of China on the Question of Hong Kong with Annexes, Beijing, December 19, 1984, ratified and entered into force on May 27, 1985, T.S. No. 26 (1985), Cmnd. 9543.

tion, Lui points to the undisputed fact that it was not until several years after 1988—when GIL made the first payment to him—that he had or knew he would have any influence over BAT–HK's cigarette allocations.

In Hong Kong, Lui faces one charge of bribery conspiracy and nine substantive bribery charges.

Sometime prior to 1993, Lui began preparations to open a business in the Philippines. He became a partner of the Subic International Cargo Center, Inc. ("SICCI"), which was incorporated in May 1993 and is involved in the warehousing and shipping of cigarettes into Asia. Lui is a primary partner of SICCI. He owns approximately 35% of the issued stock and, until his arrest, managed its day to day operations.

Hong Kong, through the Independent Commission Against Corruption (the "ICAC"), began an investigation of Lui's business activities. ICAC attempted to arrest Lui on April 26, 1994, about one year after his business in the Philippines had been established. He was then out of the country on an overseas business trip.

Although Lui apparently has not returned to Hong Kong since the spring of 1994, ICAC agents were invited to meet with him in the Philippines. For some unknown reason, the meeting never occurred, even though the agents did go to the Philippines.

A Hong Kong magistrate issued a warrant for Lui's arrest on January 23, 1995. Another warrant was issued on December 12, 1995.

Prior to his arrest, Lui and his family had spent the summer of 1995 in Canada. They had purchased a house in Toronto in 1991, and became citizens in June 1994. The purpose of their December 1995 trip to Boston was to visit a hospitalized friend. It was on their arrival at Boston's Logan Airport that Lui was arrested.

### III.

### *PROCEDURAL HISTORY*

On December 19, 1995, the United States Attorney's office filed an extradition complaint in the District Court pursuant to 18 U.S.C.A. § 3184 (West Supp.1996).[3] The complaint set forth the United Kingdom's request for the extradition of Lui on behalf of Hong Kong. A provisional warrant was issued, and Lui was arrested upon his arrival at Logan Airport in Boston, Massachusetts on December 20, 1995.

At Lui's initial appearance before Magistrate Judge Karol on December 21, 1995, the Government moved to detain him for the duration of the extradition proceedings. On February 2, 1996, after hearings, Magistrate Judge Karol issued an order allowing the Government's detention motion.

On April 3, 1996, Lui first appeared before this court in order to challenge the Magistrate Judge's detention order.[4] In an April 25, 1996 opinion, this court concluded that "special circumstances" overrode the presumption against bail in extradition cases,

---

**3.** 18 U.S.C.A. § 3184 provides:

Whenever there is a treaty or convention for extradition between the United States and any foreign government, any justice or judge of the United States, or any magistrate authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State, may, upon complaint made under oath, charging any person found within his jurisdiction, with having committed within the jurisdiction of any such foreign government any of the crimes provided for by such treaty or convention, issue his warrant for the apprehension of the person so charged, that he may be brought before such justice, judge, or magistrate, to the end that the evidence of criminality may be heard and considered. Such complaint may be filed before and such warrant may be issued by a judge or magistrate of the United States District Court for the District of Columbia if the whereabouts within

the United States of the person charged are not known or, if there is reason to believe the person will shortly enter the United States. If, on such hearing, he deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention, he shall certify the same, together with a copy of all the testimony taken before him, to the Secretary of State, that a warrant may issue upon the requisition of the proper authorities of such foreign government, for the surrender of such person, according to the stipulations of the treaty or convention; and he shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made.

**4.** On the same day, this court converted Lui's Rule 16(a) appeal of the bail order to a writ of *habeas corpus* pursuant to 28 U.S.C.A. § 2241 (West 1995). *See, e.g., Argro v. United States*, 505

and that Lui's proffered conditions of release would reasonably assure his presence at future proceedings. The court, therefore, ordered Lui's release from Plymouth County Correctional Center. *Kin–Hong v. United States,* 926 F.Supp. 1180 (D.Mass.1996).

The Court of Appeals reversed this court's bail decision on May 14, 1996, holding that no special circumstances existed sufficient to override the presumption against bail. *United States v. Kin–Hong,* 83 F.3d 523 (1st Cir.1996) (per curiam). Lui, therefore, has been detained in United States custody for more than one year, since December 20, 1995.

On May 28, 1996, Magistrate Judge Karol began a three day hearing to consider Lui's extraditability. Three months later, on August 29, 1996, he issued his opinion in which he found the evidence against Lui sufficient to sustain the bribery conspiracy charge and eight of the nine substantive bribery charges. The Magistrate Judge, thereafter, certified Lui's extraditability to Hong Kong.

Here, in his September 3, 1996 Amended Petition for a Writ of *Habeas Corpus,*[5] Lui alleges, in part, that the Treaty does not permit his extradition because he cannot be tried and punished by the requesting sovereign, the Crown Colony of Hong Kong, prior to its reversion to China. For the reasons set forth below, this court agrees.[6]

## IV.

### THE HONG KONG REVERSION TIMETABLE

Central to the pending *habeas corpus* petition and the related extradition request is the fact that the Crown Colony of Hong Kong reverts to Chinese control in less than six months, on July 1, 1997. This raises the threshold factual issue as to whether the Crown Colony of Hong Kong will be able to try and to punish Lui prior to that reversion date.

Magistrate Judge Karol did not reach the question of which sovereign, the Crown Colony of Hong Kong or China, would be the one to try and to punish Lui if he is extradited. He did speculate that Lui might not be tried by either Hong Kong or China, because he might be released after a pre-trial procedure known as a "committal hearing." Given the enormous amount of resources the Government has devoted to the task of extraditing Lui, this court rejects the unsubstantiated notion that Hong Kong would drop the charges against him upon his return.

In any event, Magistrate Karol's surmise is not relevant to the controlling issue under the Treaty: whether it is possible for the Crown Colony of Hong Kong to try and to punish Lui before reversion, should they choose to do so.[7]

The uncontradicted evidence before the court establishes conclusively that Hong Kong will be unable to try and to punish Lui before reversion.

In an affidavit, former Hong Kong Senior Assistant Crown Prosecutor Kevin Barry Egan[8] asserts that a trial of Lui could not be concluded within fourteen months of Lui's

---

F.2d 1374, 1378 (2nd Cir.1974) (parolee's appeal of revocation proceeding treated as *habeas corpus* petition); *Caporali v. Whelan,* 582 F.Supp. 217, 219 (D.Mass.1984) (deportee's complaint seeking review of Immigration and Naturalization Service's detention order treated as petition for *habeas corpus* ).

**5.** The petition was taken under advisement by this court on December 4, 1996, following an extensive briefing schedule by the parties.

**6.** Lui also challenges Magistrate Judge Karol's finding of probable cause. Given its disposition with respect to Lui's Treaty theory, this court does not reach the probable cause issue.

**7.** The Government consistently suggests that Lui is arguing that the Treaty does not authorize his extradition because he *might* be tried and punished by a non-signatory to the Treaty. This is a mischaracterization of Lui's claim. Lui actually argues that the Treaty does not authorize his extradition because it is impossible for him to be tried and punished by the requesting sovereign, the Crown Colony of Hong Kong, prior to reversion.

**8.** Mr. Egan was employed by the Hong Kong Attorney–General's Chambers (Prosecutions Division) from April 1980 through January 1991. While there, he held the positions of Crown Counsel, Senior Crown Counsel, Assistant Principal Crown Counsel, Senior Assistant Crown

surrender to Hong Kong.[9] (Egan Aff. ¶ 25). Considering that reversion will occur in less than six months, this evidence demonstrates that no trial or punishment by the Crown Colony of Hong Kong is possible prior to then.

The Government's own evidence requires the same conclusion. The Assistant Crown Prosecutor, Lena Chi Hui-ling, stated in an affidavit, dated January 12, 1996, that, "[i]f ... extradition were to be substantially delayed as a result of various legal proceedings taken after the extradition hearing, then it would be likely that Lui Kin-hong would not be tried until after June 30, 1997, [the day before reversion]...." (Chi Aff. ¶ 3). The extradition hearing was completed on May 30, 1996. Magistrate Judge Karol's opinion was issued three months later on August 29, 1996. Significantly, more than seven months have already passed since the Magistrate Judge's hearing.[10] And appeals will inevitably follow this court's decision with respect to the *habeas corpus* petition. The reality, therefore, is that the Crown Colony of Hong Kong will not be able to try and to punish Lui by the time of reversion. There is no evidence to the contrary.

If, nonetheless, Lui is extradited now, but the Crown Colony of Hong Kong is unable to

try and to punish him prior to reversion, he will then be in the custody of China, not the United Kingdom. China could, therefore, try Lui before the courts of the Hong Kong Special Administrative Region (the "HKSAR"). *Id.* If found guilty, Lui would be punished, not by the Crown Colony of Hong Kong or the United Kingdom, but by China.

At oral argument, the Government contended that this court lacks jurisdiction to examine the reality of whether Hong Kong would be competent to satisfy its obligation under the treaty to try and to punish Lui prior to reversion. Transcript of November 18 hearing at 8. In support, the Government cited the case of *Terlinden v. Ames*, 184 U.S. 270, 22 S.Ct. 484, 46 L.Ed. 534 (1902). In *Terlinden*, the Supreme Court stated that:

Undoubtedly treaties may be terminated by the absorption of powers into other nationalities and the loss of separate existence, as in the case of Hanover and Nassau, which became by conquest incorporated into the Kingdom of Prussia in 1866. Cessation of independent existence rendered the execution of treaties impossible. But where sovereignty in that respect is not extinguished, and the power to execute remains unimpaired, outstanding treaties

Prosecutor, and on occasion, acting Deputy Crown Prosecutor.

9. Egan bases his opinion on the timing of Hong Kong criminal procedure. He explains that after his extradition to Hong Kong, Lui would appear in court every eight days until the prosecutor seeks a "return date." The "return date," when finally sought, must be scheduled for between ten and forty-two days after the prosecutor's request. Egan explains that Lui's "return date" would inevitably be scheduled for forty-two days after the request, due to the case's complexity.

Moreover, Egan avers that a "return date" can be vacated and rescheduled at any time. Egan states that, in complex cases such as Lui's, such rescheduling often occurs.

On the "return date," Lui would have the right to demand a committal hearing. According to Egan, that hearing would happen four to six months after the "return date." He bases this opinion on his experience and the case of Lui's co-defendant, Chong Tsoijun, who did not have his committal hearing until ten months after he was charged.

10. The process has moved expeditiously. The critical dates are as follows:

| | |
|---|---|
| Lui's arrest: | December 20, 1995 |
| Detention Hearing: | January 10, 1996 |
| Magistrate Judge Orders Detention: | February 4, 1996 |
| Hearings on Habeas Petition: | April 4 and April 22, 1996 |
| District Court's Opinion: | April 25, 1996 |
| Court of Appeals Opinion: | May 14, 1996 |
| Magistrate Judge's Hearing: | May 28–30, 1996 |
| Magistrate Judge's Opinion | August 29, 1996 |
| Scheduling Conference: | September 5, 1996 |
| Initial Brief's Received: | November 8, 1996 |
| Habeas Corpus Hearing: | November 18, 1996 |
| Final Brief Received: | December 4, 1996 |

cannot be regarded as avoided because of impossibility of performance.

*Id.* at 283, 22 S.Ct. at 489.

Contrary to the Government's contention, this court interprets *Terlinden* to authorize inquiry into Hong Kong's ability to try and to punish Lui. The fact is that, in less than six months, the Crown Colony of Hong Kong will experience "cessation of independent existence" as a colony of the United Kingdom. This means that, upon reversion, it will be impossible for the United Kingdom, through the Crown Colony of Hong Kong, to try and to punish Lui pursuant to its extradition request.

*Terlinden* involved a case in which the German Empire requested extradition under a treaty between the United States and the Kingdom of Prussia. The Court found that the Kingdom of Prussia, while part of the German Empire, continued to have an independent existence, and could still execute its responsibilities under the treaty. *See id.* at 285, 22 S.Ct. at 490.

Here, however, the Crown Colony of Hong Kong will be no more as of July 1, 1997. It will be in the same position as a sovereign taken by conquest. It will cease to have any existence beyond that as a part of China. In such a situation, *Terlinden* teaches that this court has jurisdiction to examine whether Hong Kong is able to fulfill its obligations as a requesting sovereign under the Treaty. As discussed earlier, the evidence shows that it cannot. China is the only sovereign that will be able to try and to punish Lui. China is not a signatory to the Treaty. As shall be discussed below, the Treaty, by its own terms, does not allow the extradition of a person to Hong Kong if the Crown Colony of Hong Kong is unable to try and to punish that person.

## V.

### THE LAW

#### A. "Extradition" Defined

■ No person may be extradited absent a valid treaty between the requesting sovereign and the requested sovereign.[11] *See Factor v. Laubenheimer,* 290 U.S. 276, 287, 54 S.Ct. 191, 193, 78 L.Ed. 315 (1933); *In re Howard,* 996 F.2d 1320, 1329 (1st Cir. 1993). The Supreme Court has defined "extradition" as "the surrender by one nation to another of an individual accused or convicted of an offense outside of its own territory, and within the territorial jurisdiction of the other, which, *being competent to try and to punish him,* demands the surrender." *Terlinden,* 184 U.S. at 289, 22 S.Ct. at 491 (emphasis supplied). And so, to be a competent requesting party, under the terms of an extradition treaty, a sovereign must be able to try and to punish the subject of the request, the relator.[12]

### B. Jurisdiction

There is a valid treaty between the United States and the United Kingdom that covers the Crown Colony of Hong Kong. The United States has no extradition treaty with the Peoples Republic of China.

Hong Kong reverts to China in 174 days, on July 1, 1997. Lui asserts that, because of this time constraint, it is impossible for the United Kingdom, as the requesting party, to try and to punish him, through its Crown Colony of Hong Kong, prior to reversion. Under the doctrine of *Terlinden,* therefore, the United Kingdom is incompetent to live up to the terms of its extradition agreement with the United States, because Hong Kong will have reverted to China before he can be tried and punished by the Crown Colony. For these reasons, Lui argues, Magistrate Judge Karol had no jurisdiction to permit extradition.

■ A Magistrate Judge's allowance of extradition, pursuant to 18 U.S.C. § 3184, is not a final order. *Koskotas v. Roche,* 931 F.2d 169, 171 (1st Cir.1991). A relator, therefore, may not directly appeal such a

---

**11.** The "requesting sovereign" is the one seeking extradition of the accused. The "requested sovereign" is the one with custody of the accused.

**12.** In an extradition case, such as the one presently before the court, the "relator" is the party seeking to stop extradition through a writ of *habeas corpus.*

decision. *Id.* It is appropriate, however, to attack the Magistrate Judge's order collaterally by seeking a writ of *habeas corpus*, which is what Lui has done here. *Id.*

## VI.

### THE LANGUAGE OF THE TREATY

▇ The language of the Treaty itself prohibits a person from being extradited to Hong Kong if Hong Kong, as a Crown Colony of the United Kingdom, is unable to try and to punish him. Specifically, 1) the Warrant provision, 2) the Dual Criminality provision, 3) the Political Offense provisions, and 4) the Specialty provisions of the Treaty all establish that Lui cannot be extradited to a sovereign that is not able to try and to punish him, any more than he could be extradited to a non-signatory nation.

### A. Warrant Requirement

▇ Articles VII(3) and VII(5) of the Treaty impose a Warrant requirement for extradition.[13] The requesting sovereign must present a warrant to the requested sovereign signifying that the relator is charged with, or has been convicted of, an extraditable offense in the courts of the requesting sovereign. The Warrant requirement permits the requested sovereign to know that the relator has been accused or convicted pursuant to the laws of the requesting sovereign, and that he will be tried and punished in accordance with that sovereign's laws.

### B. Dual Criminality Requirement

Pursuant to its Dual Criminality provisions, the Treaty requires that the courts of the requested sovereign examine the criminal laws of the requesting sovereign. The court of the requested sovereign must decide whether the charged offense fits "the descriptions [of extraditable offenses] listed in the Schedule annexed to [the] Treaty, . . . or

[is] any other offense" that is a felony under the laws of both signatories. Article III.

▇ The purpose of the Dual Criminality requirement is to provide the requested sovereign with the opportunity to examine the substantive law of the requesting sovereign in the context of the Treaty. *See also* Article VII(2)(b), (c) and (d). Here, it underscores the expectation running through the Treaty that the relator, Lui, is to be tried, judged, and punished in accordance with the laws of the requesting sovereign, the Crown Colony of Hong Kong.

### C. The Political Offense Provisions

Article 3(a) of the Supplementary Treaty reads as follows:

> Notwithstanding any other provision of this Supplementary Treaty, extradition shall not occur if the person sought establishes to the satisfaction of the competent judicial authority by a preponderance of the evidence that the request for extradition has in fact been made with a view to try or punish him on account of his race, religion, nationality, or political opinions, or that he would, if surrendered, be prejudiced at his trial, or punished, detained or restricted in his personal liberty by reason of his race, religion, nationality or political opinions.

This article requires the court to examine the reasons for the requesting sovereign's desire to try and to punish the relator. It looks to the motive of the requesting sovereign, not some non-signatory nation. And it underscores again the Treaty's requirement and expectation that extradition, here, may not take place if the requesting sovereign, the Crown Colony of Hong Kong, is unable to try and to punish Lui in the relatively few days left before its reversion to China.

---

13. The provision of Article VII requiring a warrant reads as follows:

    (3) If the request [for extradition] relates to an accused person, it must also be accompanied by a warrant of arrest issued by a judge, magistrate or other competent authority in the territory of the requesting Party and by such

    evidence as, according to the law of the requested Party, would justify his committal for trial if the offense had been committed in the territory of the requested Party, including evidence that the person requested is the person to whom the warrant of arrest refers.

## D. Specialty Provisions

Article XII of the Treaty [14] prohibits the requesting sovereign from trying and punishing the relator for crimes other than those for which he has been extradited, or from extraditing the relator to a third-party sovereign.[15] This section demonstrates once again that the Treaty allows only for extradition for offenses that can be tried and punished by the requesting sovereign.

The United States cannot enforce the Specialty provisions once extradition takes place. The adoption of these provisions, and of the Treaty itself, is premised on the trust running between the United States and the United Kingdom. The United Kingdom is promising that it, and only it, will try and will punish Lui for specified crimes, and no others. By its adoption of the Treaty, the United States manifests its belief in that promise of the United Kingdom.

China has made no such promises to the United States. Indeed, as has been pointed out, the United States has no extradition treaty with China.

The Treaty is exclusively between the signatories. Hong Kong reverts to China on July 1, 1997. The terms of the Treaty do not.

## VII.

### THE LEGISLATIVE HISTORY

Not only does the language of the Treaty support the view that the United States may not extradite Lui, so, too, does the history of the Senate's ratification.[16]

The version of the Supplementary Treaty initially presented to the Senate greatly narrowed the usual Political Offense exception found in other United States extradition treaties. *Supplementary Extradition Treaty Between the United States and the Kingdom of Great Britain and Northern Ireland: Hearing Before the Subcommittee on the Constitution of the Senate Committee on the Judiciary*, 99th Cong., 1st Sess. 16–22 (1985) (letter from the President transmitting Supplementary Treaty to the Senate). The new version narrowed the Political Offense exception to apply only to "pure political and nonviolent crimes." *Supplementary Extradition Treaty Between the United States and the Kingdom of Great Britain and Northern Ireland: Hearing Before the Senate Committee on Foreign Relations*, 99th Cong., 1st Sess. 4–5 (1985) (statement of Abraham D. Sofaer, Legal Advisor, Department of State). Apparently, the proposed change arose from a controversy regarding the United States' failure to extradite three Provisional Irish Republican Army members to the United Kingdom.

In the Senate Foreign Relations Committee, some Senators expressed concern over the narrow Political Offense exception. The proponents of the narrowed exception believed that it was appropriate in view of the United States' trust in the judicial and penal systems of the United Kingdom. They assured the questioning Senators that the United Kingdom would grant fair trial and punishment.

Later, other Senators expressed the same concern about the narrowed exception on the floor of the Senate during debate over ratifi-

**14.** Article XII(1), the specialty provision, reads as follows:

(1) A person extradited shall not be detained or proceeded against in the territory of the requesting Party for any offense other than an extraditable offense established by the facts in respect of which his extradition has been granted, or on account of any other matters, nor be extradited by that Party to a third State—
(a) until after he has returned to the territory of the requested Party; or
(b) until the expiration of thirty days after he has been free to return to the territory of the requested Party.

**15.** Lui is not alleging that the reversion of Hong Kong to Chinese rule would constitute "extradition" to China in violation of Article XII. The court, therefore, does not reach the question of whether reversion, itself, results in the violation of the Specialty provisions.

**16.** It is entirely proper for this court to go beyond the words of the Treaty and Supplementary Treaty to examine "the negotiations and diplomatic correspondence of the contracting parties relating to the subject matter, and to their own practical construction of it." *Factor v. Laubenheimer*, 290 U.S. 276, 294–95, 54 S.Ct. 191, 196, 78 L.Ed. 315 (1933).

cation. 99th Cong., 2d Sess., 132 Cong.Rec. 9119–71 (daily ed. July 16, 1986). Once again, they were assured by the Supplementary Treaty's proponents that the United States could trust the United Kingdom and its judicial process to be fair and just. *See, e.g., id.* at 9166–67. The Senate then ratified the Supplementary Treaty, with a narrowed version of the political offense exception, by the required two-thirds vote.

The Senate's ratification was clearly premised on its trust in the judicial and penal systems of the United Kingdom. To permit the benefits of that trust to be assumed by any non-signatory nation would undermine the clear and unequivocal intent of the Senate. It is clear beyond rational dispute that the Senate would not have ratified had there been any suggestion that the Treaty provisions could be extended, even by circumstance, to China.

This court's interpretation of the legislative record is bolstered by the Senate's Declaration in its Resolution of Ratification of the Supplementary Treaty. The Declaration reads:

> The Senate of the United States declares that it will not give its advice and consent to any treaty that would narrow the political offense exception with a totalitarian or other non-democratic regime and that nothing in the Supplementary Treaty with the United Kingdom shall be considered a precedent by the executive branch or the Senate for other treaties.

*Id.* at 9120 (enacted). The Senate could not have intended a treaty which contains such language to be used to extradite a relator for eventual trial and punishment in China, a non-democratic regime.[17]

The Government suggests that the legislative history of the Political Offense provisions should not be used as persuasive authority regarding the other sections of the Treaty and Supplementary Treaty. The court disagrees. The court considers it powerful evidence that the Senate wished the Treaty to apply only to relators who could be tried and punished by a signatory sovereign whose credentials and trust had been weighed and judged by the United States.

This court is not making a judgment about the judicial and penal systems of China or of the HKSAR. Under this court's analysis, it would not matter if China's legal system were *more* efficient and humane than either the United States' or the United Kingdom's. The bottom line is that the terms of the Treaty do not allow extradition when the requesting sovereign is unable to try and to punish the relator. The Crown Colony of Hong Kong will be unable to try and to punish Lui prior to reversion. If Lui is in Hong Kong after reversion, China would be in a position to try and to punish him. To permit such an untoward result would be to ignore the clear language of the Treaty and to contravene the will of the Senate.

## VIII.

### THE GOVERNMENT'S VARIOUS RESPONSES

#### A. Consequences of Interpretation

The Government argues that a parade of horribles would result from an interpretation

---

**17.** Considering the information regarding China's judicial and penal systems now in the public domain, it strains credulity to suggest that the Senate would approve of the Treaty's application, with its narrowed Political Offense provisions, to a relator who can only be tried by the Chinese judiciary.

The Chinese judicial system, for example, gave an eleven year sentence to Wang Dan for the "crime" of writing articles critical of the Chinese government. Steven Mufson, *Sentencing Is Blow To China Dissidents; Movement Drained as Leader Gets 11 Years*, Wash. Post, October 31, 1996, at A23. Wang Dan's trial only lasted three or four hours. *Id.* In a recent article on China's "Strike Hard" anti-crime campaign, the Washington

Post reported that, "the time from arrest to trial is often a matter of days; the time from sentencing to execution can be measured in the minutes it takes to walk a prisoner to a field, level a pistol at his head and pull the trigger." Keith B. Richburg, *China Executes Hundreds in Crackdown; Crime Wave Brings Arrests, Quick Trials*, Wash. Post, July 6, 1996, at A1.

Already, there are signs that the HKSAR judicial system will appear very much like the Chinese judicial system. *See* Simon Winchester, *Hong Kong: On Trial*, Nat'l L.J., December 16, 1996, at A1. The Senate, concerned as it was with the narrowness of the political offense exception, did not intend for the Treaty to apply to such a judicial system.

of the Treaty as adopted by the court today. The court disagrees.

■ The Government is concerned that the court's interpretation will halt all extraditions to Hong Kong. Citing the *Howard* case, 996 F.2d at 1331, it argues that a court should not interpret an extradition treaty in such a way that it becomes a "non-extradition treaty." First and foremost, an extradition treaty must be interpreted according to its terms. Here, the terms of the Treaty do not allow for Lui's extradition. The court, therefore, is not eviscerating the Treaty as the Government suggests. The court is enforcing the Treaty as written and ratified.

The court's interpretation does not lead to the Government's conclusion that all extraditions to Hong Kong over recent years have been in violation of the Treaty. Extradition is permitted in all cases except those where Hong Kong is unable to try and to punish the relator. In any case in which Hong Kong, at the time of extradition, was able to try and to punish a relator, regardless of whether it did try and did punish him, the Treaty could apply, and the extradition could be lawful.

■ It is also incorrect that this court's interpretation will require the United States, at the time of reversion, to insist on the release of those relators who are still on trial or are incarcerated awaiting trial. Those who were extradited when it was *possible* for the Crown Colony of Hong Kong to try and to punish them get no comfort from this court's conclusions today. Here, the uncontroverted evidence shows that it is *impossible* for Hong Kong to try and to punish Lui prior to reversion.

■ In any event, even if the court were to agree with the Government regarding the logistical consequences of its interpretation

of the Treaty, such concerns would be irrelevant. The court's responsibility in examining Lui's *habeas corpus* petition is solely to determine whether the Treaty authorizes his extradition. It does not. The court must adhere to the law, regardless of the consequences.

### B. Four Treaty Provisions

The Government contends that none of the four provisions of the Treaty mentioned in Section VI should be considered with respect to Lui's petition. Again, this court disagrees.

The court refers to the Warrant requirement, the Dual Criminality requirement, the Political Offense provision, and the Specialty provision only to demonstrate that the Treaty and the Supplementary Treaty, as ratified by the Senate, do not, by their own terms, allow for the extradition of Lui when it is certain that his trial and punishment would not be at the hands of the requesting sovereign, the Crown Colony of Hong Kong.

### C. The Hong Kong Policy Act

In 1992, the Congress passed, and the President signed, the Hong Kong Policy Act (the "Act"), 22 U.S.C.A. §§ 5701–32 (West Supp.1996). The Act provides that all treaties with Hong Kong will remain in force at least until reversion. 22 U.S.C. § 5721(b) (West Supp.1996).[18] It also gives the President means by which he may continue treaties post-reversion. *Id.*

■ The Government is not claiming that the Act, in and of itself, extends the Treaty in such a way that it applies to Lui. The Government conceded at oral argument that, should the President and Congress do nothing between now and reversion, Lui would go

**18.** 22 U.S.C. § 5721(b) reads as follows:

(b) International agreements

For all purposes, including actions in any court in the United States, the Congress approves the continuation in force on and after July 1, 1997, of all treaties, and other international agreements, including multilateral conventions, entered into before such date between the United States and Hong Kong, or entered into before such date between the United States and the United Kingdom and applied to Hong Kong, unless or until termi-

nated in accordance with law. If in carrying out this subchapter, the President determines that Hong Kong is not legally competent to carry out its obligations under any such treaty or other international agreement, or that the continuation of Hong Kong's obligations or rights under any such treaty or other international agreement is not appropriate under the circumstances, such determination shall be reported to the Congress in accordance with section 5731 of this title.

free. *See* Transcript of November 18 hearing at 41. The Government, rather, is suggesting that the Act is evidence of Congressional intent that the Treaty should extend to relators in Lui's position. The court disagrees.

The Government argues that if Congress had intended that the Treaty not permit extradition of a relator who, like Lui, could not be tried and punished by the Crown Colony of Hong Kong prior to reversion, some member of Congress would have raised the issue during debate over the Act. Such a contention implicitly assumes, however, that Congress had intended the Act to extend the Treaty past reversion even absent any further action on its part. But, there is strong evidence that Congress did not so intend and, indeed, intended the contrary.

At hearings preceding the passage of the Act, the State Department's Deputy Legal Advisor informed a Congressional committee that:

> on extradition—we are now negotiating with the Hong Kong Government on a new treaty, to replace the existing U.S.-U.K. agreement, which would continue in force after reversion to [China]. *Consistent with U.S. practice in the extradition area, we intend to seek Senate advice and consent to such a treaty if negotiations are successful.*

*Hong Kong's Reversion to China and Implications for U.S. Policy: Hearing Before the Subcommittee on East Asian and Pacific Affairs of the Senate Committee on Foreign Relations,* 102nd Cong., 2d Sess., 17 (1992) (prepared statement of Jamison M. Selby, Deputy Legal Advisor, Department of State) (emphasis supplied). It is apparent, therefore, that Congress passed the Act with the understanding that any extradition to China for trial and punishment would require the approval of a new treaty with Senate advice and consent.

Moreover, the Act is only evidence that Congress supports the continuation of treaties with Hong Kong *according to their own terms.* The terms of the Treaty at issue here do not authorize the extradition of Lui where it is impossible for the Crown Colony of Hong Kong to try and to punish him prior

to reversion. *See supra* Part VI. The Act does not amend the Treaty. A substantive change that would allow Lui to be tried and punished by China, as opposed to the Crown Colony of Hong Kong, would require the advice and consent of the Senate pursuant to the Constitution. U.S. Const. art. II, § 2. *See New York Chinese TV Programs, Inc. v. U.E. Enterprises, Inc.,* 954 F.2d 847, 853-54 (2nd Cir.1992).

### D. Case Law

The Government contends that every court that has interpreted the Treaty has rejected this court's interpretation, and allowed extradition even though a relator *might* be tried by China. The Government is incorrect. None of the three cases cited are inconsistent with this court's analysis.

In *Oen Yin–Choy v. Robinson,* 858 F.2d 1400 (9th Cir.1988), *cert. denied,* 490 U.S. 1106, 109 S.Ct. 3157, 104 L.Ed.2d 1020 (1989), the court examined two arguments similar to Lui's. First, it rejected the contention that Hong Kong's reversion acted as an extradition to China in violation of the specialty provision of the Treaty. *Id.* at 1403-04. Second, it held that, although the United Kingdom could not guarantee that China would honor all the provisions of the Treaty after reversion, extradition to Hong Kong with the possibility of trial and punishment by China *eight years in the future* was not barred. *Id.* at 1404. Lui raises the same issue that the *Oen* court thought proper to examine. But, Lui's claim is different. Lui does not argue that the *possibility* of trial and punishment by China bars extradition. He argues that the *certainty* that the Crown Colony of Hong Kong *cannot* try and punish him prior to reversion, *in 174 days*— not eight years—bars his extradition pursuant to the Treaty.

The Government also cites *Extradition of Tang Yee–Chun,* 674 F.Supp. 1058 (S.D.N.Y. 1987). *Tang* is not contrary to this court's rationale today. Indeed, the court there noted that any concern about the effects of reversion were "too speculative and too remote to justify any action by this Court." *Tang,* 674 F.Supp. at 1068. That was a

reasonable observation nine years before reversion. But, today, with less than six months left before reversion, it is clear that the Treaty's violation is no longer "too speculative" or "too remote" for remedial action.

The Government, lastly, relies on *Cheng Na–Yuet v. Hueston*, 734 F.Supp. 988 (S.D.Fla.1990), *aff'd* 932 F.2d 977 (11th Cir. 1991). There, the court thought it proper to examine the same issue raised by Lui here. But, as in *Tang*, the court noted that looking to China's potential actions after reversion was "too speculative and too remote to justify any action by this court." *Id.* at 993. That view, while arguably legitimate seven years ago, is inapposite to the reality of today, less than six months before reversion.

### E. Reviewability

■■■■■ *Habeas corpus* review in an extradition case is very limited. *See Koskotas v. Roche*, 931 F.2d 169, 171 (1st Cir.1991). Its purpose is "only to inquire whether the magistrate had jurisdiction, whether the offense charged is within the treaty, and ... whether there was any evidence warranting the finding that there was reasonable ground to believe the accused guilty." *Id.* (quoting *Fernandez v. Phillips*, 268 U.S. 311, 312, 45 S.Ct. 541, 542, 69 L.Ed. 970 (1925)). The Government argues that this court lacks jurisdiction to examine Lui's claim that the Treaty does not permit his extradition to a sovereign which is unable to try and to punish him.

■■■■ The Government also contends that, because Lui's argument regarding the inapplicability of the Treaty to him is non-jurisdictional and non-constitutional, he has waived it by not raising it before the Magistrate Judge. *See Lo Duca v. United States*, 93 F.3d 1100, 1111 (2nd Cir.1996) (citing *Jhirad v. Ferrandina*, 536 F.2d 478, 486 (2nd Cir.1976); *Austin v. Healey*, 5 F.3d 598, 601 (2nd Cir.1993)).

The court rejects the Government's contentions on the grounds that Lui's argument regarding the applicability of the Treaty is jurisdictional and is, therefore, an appropriate issue for this court to consider in a *habeas corpus* proceeding.

This court has the responsibility of determining whether the Treaty, together with 18 U.S.C. § 3184, grants the Magistrate Judge the authority to permit extradition. If the Magistrate Judge lacks the authority to do so, he lacks jurisdiction. The other courts which have examined the effect of reversion on extradition have found that whether a party to a treaty will be able to fulfill its obligations is fundamental to the Magistrate Judge's authority and jurisdiction. *See, e.g., Oen*, 858 F.2d at 1403 (reached merits when relator "argues that the district court lacked jurisdiction to order his extradition because the Hong Kong Government has not satisfied requirements of the extradition Treaty"); *Cheng*, 734 F.Supp. at 992 (reached merits when relator argued that "Magistrate lacked jurisdiction to certify extradition since the Reversion of the government of Hong Kong to the People's Republic of China in 1997 makes it impossible for Hong Kong to comply with various terms of the Treaty"). Whether the Treaty allows for the extradition of Lui to the Crown Colony of Hong Kong, a sovereign that can neither try nor punish him prior to reversion, is, therefore, a question of the Magistrate Judge's jurisdiction, which this court may address.

## IX.

### STATE SUCCESSION

■■■ The Government has not explicitly relied upon the doctrine of state succession. But, in its opposition brief it mentions that the Sino–British Joint Liaison Group recently approved a new extradition agreement. This agreement may lay the groundwork for a claim that a new treaty with China, approved by two-thirds of the Senate, is not necessary in order to extradite Lui. The court disagrees.

■■■ Under the doctrine of state succession, a sovereign may take upon itself all the responsibilities and duties under a treaty of a predecessor sovereign if all parties agree. *See Terlinden*, 184 U.S. at 282–88, 22 S.Ct. at 489–91. State succession cannot occur here. In order for China to accept all responsibilities of the Treaty, it must accept the Supplementary Treaty as well. The Supplementary

Treaty includes the Senate's Declaration of Ratification, which states that:

> The Senate of the United States declares that it will not give its advice and consent to any treaty that would narrow the political offense exception with a totalitarian or other non-democratic regime and that nothing in the Supplementary Treaty with the United Kingdom shall be considered a precedent by the executive branch or the Senate for other treaties.

132 Cong.Rec. S 9120 (daily ed. July 16, 1986). China, being a non-democratic regime, cannot meet the Political Offense requirements as amended by the Supplementary Treaty.

## X.

### *THE NON–INQUIRY DOCTRINE*

 The Government argues that, under the non-inquiry doctrine, the court should not inquire into the effect of reversion on Lui. The doctrine "forbids judicial authorities from investigating the fairness of a requesting nation's justice system when considering whether to permit extradition to that nation." *Howard,* 996 F.2d at 1329.

But, this court's analysis has not violated the non-inquiry doctrine. Indeed, this court's interpretation of the Treaty is consistent with the purposes behind the non-inquiry doctrine. The non-inquiry doctrine teaches that the Judicial Branch should not interfere with a judgment by the Executive and Legislative Branches that, "the treaty partner's justice system [is] sufficiently fair to justify sending accused persons there for trial." *Id.* Here, the court's interpretation of the Treaty is based in large measure on its recognition that the Executive and Legislative Branches have judged the justice system of the United Kingdom and the Crown Colony of Hong Kong to be sufficiently fair to send accused persons there for trial. But, no such judgment was made as to Chi-

na, the sovereign which, in reality, will try and will punish Lui if the extradition is allowed.

## XI.

### *CONCLUSION*

For the reasons discussed above, this court concludes that Magistrate Judge Karol lacked jurisdiction to authorize the extradition of Lui. The court, therefore, grants Lui's Amended Petition for a Writ of *Habeas Corpus.* [19]

An order will issue.

---

19. Lui also asserts that reversion requires the court to examine the treatment he is likely to receive at the hands of the Chinese judicial and penal systems. He claims that the conditions would be so terrible that the court should bar his extradition even if the Treaty would normally permit it.

Lui's claim is not frivolous. *See supra* note 17. The court, however, does not reach this issue, or, as noted earlier, the issue of whether Magistrate Judge Karol erred in finding probable cause for the crimes charged, because of its holding that Magistrate Judge Karol lacked jurisdiction.