United States Court of Appeals
For the First Circuit


No. 97-1084

UNITED STATES OF AMERICA,

Appellant,

v.

LUI KIN-HONG, a/k/a JERRY LUI,

Appellee.

ERRATA SHEET ERRATA SHEET

The opinion of the court is corrected as follows:

On p.10, l.18-19, replace "132 Cong. Rec. S9251 (1986)" with "132
Cong. Rec. 16,819 (1986)"

On p.10, n.6, replace "132 Cong. Rec. S9119 (1986)" with "132
Cong. Rec. 16,598 (1986)"

On p.11, l.12, replace "143 Cong. Rec. S1846 (1997)" with "143
Cong. Rec. S1846 (daily ed. Mar. 3, 1997)" 

United States Court of Appeals
For the First Circuit


No. 97-1084

UNITED STATES OF AMERICA,

Appellant,

v.

LUI KIN-HONG, a/k/a JERRY LUI,

Appellee.



APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Joseph L. Tauro, U.S. District Judge] 



Before

Boudin, Circuit Judge,  
Aldrich, Senior Circuit Judge,  
and Lynch, Circuit Judge. 


Alex Whiting, Assistant United States Attorney, with whom Donald 
K. Stern, United States Attorney, and Susan Hanson-Philbrick, 
Assistant United States Attorney were on brief, for the United States.
Andrew Good, with whom Harvey A. Silverglate and Silverglate & 
Good were on brief, for appellee. 
Michael Posner and John Reinstein on brief for Lawyer's Committee 
for Human Rights and American Civil Liberties Union of Massachusetts,
amici curiae in support of appellee.


March 20, 1997


LYNCH, Circuit Judge. The United States District LYNCH, Circuit Judge 

Court granted a writ of habeas corpus to Lui Kin-Hong

("Lui"), who sought the writ after a magistrate judge

certified to the Secretary of State that she may, in her

discretion, surrender Lui for extradition to the Crown Colony

of Hong Kong. The United Kingdom, on behalf of Hong Kong,

had sought Lui's extradition on a warrant for his arrest for

the crime of bribery. Lui's petition for habeas corpus was

premised on the fact that the reversion of Hong Kong to the

People's Republic of China will take place on July 1, 1997,

and it will be impossible for the Crown Colony to try and to

punish Lui before that date. The United States appeals. We

reverse the order of the district court granting the writ of

habeas corpus.

The United States argues that Lui is within the

literal terms of the extradition treaties between the United

States and the United Kingdom, that the courts may not vary

from the language of the treaties, and that the certification

must issue. Lui argues that the language of the treaties

does not permit extradition, an argument which is surely

wrong. Lui's more serious argument is that the Senate, in

approving the treaties, did not mean to permit extradition of

someone to be tried and punished by a government different

from the government which has given its assurances in the

treaties. 

Lui does not claim that he faces prosecution in

Hong Kong on account of his race, religion, nationality, or

political opinion. He does not claim to be charged with a

political offense. The treaties give the courts a greater

role when such considerations are present. Here, Lui's

posture is that of one charged with an ordinary crime. His

claim is that to surrender him now to Hong Kong is, in

effect, to send him to trial and punishment in the People's

Republic of China. The Senate, in approving the treaties,

could not have intended such a result, he argues, and so the

court should interpret the treaties as being inapplicable to

his case. Absent a treaty permitting extradition, he argues,

he may not be extradited.

While Lis it persuasive. The Senate was well aware

of the reversion when it approved a supplementary treaty with

the United Kingdom in 1986. The Senate could easily have

sought language to address the reversion of Hong Kong if it

were concerned, but did not do so. The President has

recently executed a new treaty with the incoming government

of Hong Kong, containing the same guarantees that Lui points

to in the earlier treaties, and that treaty has been

submitted to the Senate. In addition, governments of our

treaty partners often change, sometimes by ballot, sometimes

by revolution or other means, and the possibility or even

certainty of such change does not itself excuse compliance

-4- 4

with the terms of the agreement embodied in the treaties

between the countries. Treaties contain reciprocal benefits

and obligations. The United States benefits from the

treaties at issue and, under their terms, may seek

extradition to the date of reversion of those it wants for

criminal offenses.

Fundamental principles in our American democracy

limit the role of courts in certain matters, out of deference

to the powers allocated by the Constitution to the President

and to the Senate, particularly in the conduct of foreign

relations. Those separation of powers principles, well

rehearsed in extradition law, preclude us from rewriting the

treaties which the President and the Senate have approved.

The plain language of the treaties does not support Lui.

Under the treaties as written, the courts may not, on the

basis of the reversion, avoid certifying to the Secretary of

State that Lui may be extradited. The decision whether to

surrender Lui, in light of his arguments, is for the

Secretary of State to make.

This is not to say American courts acting under the

writ of habeas corpus, itself guaranteed in the Constitution,

have no independent role. There is the ultimate safeguard

that extradition proceedings before United States courts

comport with the Due Process Clause of the Constitution. On

the facg presenting a serious constitutional issue of denial

-5- 5

of due process. Some future case may, on facts amounting to

a violation of constitutional guarantees, warrant judicial

intervention. This case does not.

I.

We repeat the facts essentially as we stated them

in our earlier opinion. United States v. Lui Kin-Hong, 83 

F.3d 523 (1st Cir. 1996) (reversing district court's decision

to release Lui on bail).

Lui is charged in Hong Kong with conspiring to

receive and receiving over US $3 million in bribes from Giant

Island Ltd. ("GIL") or GIL's subsidiary, Wing Wah Company

("WWC"). Lui, formerly a senior officer of the Brown &

Williamson Co., was "seconded" in 1990 to its affiliated

company, the British American Tobacco Co. (Hong Kong) Ltd.

("BAT-HK"), where he became Director of Exports in 1992. The

charges result from an investigation by the Hong Kong

Independent Commission Against Corruption ("ICAC"). The Hong

Kong authorities charge that GIL and WWC, to which BAT-HK

distributed cigarettes, paid bribes in excess of HK $100

million (approximately US $14 to $15 million) to a series of

BAT-HK executives, including Lui. The bribes were allegedly

given in exchange for a virtual monopoly on the export of

certain brands of cigarettes to the People's Republic of

China ("PRC") and to Taiwan. Among the cigarettes

-6- 6

distributed were the popular Brown & Williamson brands of

Kent, Viceroy, and Lucky Strike. GIL purchased three-

quarters of a billion dollars in cigarettes from 1991 to

1994, mostly from BAT-HK.

A former GIL shareholder, Chui To-Yan ("Chui"),

cooperated with the authorities and, it is said, would have

provided evidence of Lui's acceptance of bribes. Some of

Lui's alleged co-conspirators attempted to dissuade Chui from

cooperating. Chui was later abducted, tortured, and

murdered. The ICAC claims that the murder was committed to

stop Chui from testifying. Lui is not charged in the murder

conspiracy. Lui was in the Philippines (which has no

extradition treaty with Hong Kong) on a business trip when

the Hong Kong authorities unsuccessfully sought to question

him in April 1994. Lui has not returned to Hong Kong since

then. 

At the request of the United Kingdom ("UK"), acting

on behalf of Hong Kong, United States marshals arrested Lui

as he got off a plane at Boston's Logan Airport on December

20, 1995. The arrest was for the purpose of extraditing Lui

to Hong Kong.1 The government asked that Lui be detained

pending completion of the extradition proceedings. The

 

1. The most recent warrant for Lui's arrest from the Hong
Kong authorities is dated February 5, 1996; there were
earlier warrants.

-7- 7

magistrate judge, after a hearing, denied Lui's request to be

released on bail.

The district court, on April 25, 1996, reversed the

order of the magistrate judge and released Lui on bail and

conditions. Lui Kin-Hong v. United States, 926 F. Supp. 1180 

(D. Mass. 1996). The district court held that the reversion

of Hong Kong to the PRC on July 1, 1997, raised complex legal

issues that would result in protracted proceedings and

presented a "special circumstance" overriding the presumption

against bail. Id. at 1189. That court also found that there 

were conditions of release that would adequately ensure Lui's

presence at future proceedings. Id. at 1196. This court 

reversed the district court and, on May 14, 1996, ordered Lui

held pending the resolution of the extradition certification

issue. Lui, 83 F.3d at 525. 

The magistrate judge commenced extradition hearings

on May 28, 1996. Those proceedings, during which evidence

was taken, lasted three days. The magistrate judge found

that there was probable cause to believe that Lui had

violated Hong Kong law on all but one of the charges in the

warrant.2 Magistrate Judge Karol, pursuant to 18 U.S.C. 

3184, issued a careful decision certifying Lui's

extraditability on August 29, 1996. In re Extradition of Lui 

 

2. The magistrate judge found the government had not met its
burden of showing probable cause as to Count 2, concerning a
payment of HK $1,953,260 made on or about October 21, 1988.

-8- 8

Kin-Hong ("Lui Extradition"), 939 F. Supp. 934 (D. Mass. 

1996). On September 3, 1996, Lui filed an amended petition

for a writ of habeas corpus, the only avenue by which a

fugitive sought for extradition (a "relator") may attack the

magistrate judge's decision,3 with the district court.

After a hearing, the district court issued a

memorandum and order granting the writ on January 7, 1997.

Lui Kin-Hong v. United States ("Lui Habeas"), --- F. Supp. -- 

-, 1997 WL 37477 (D. Mass. Jan. 7, 1997). The district

court reasoned that, because the Crown Colony could not try

Lui and punish him before the reversion date, the extradition

treaty between the United States and the UK, which is

applicable to Hong Kong, prohibited extradition. Id. at ---, 

*4-*5. Because no extradition treaty between the United

States and the new government of Hong Kong has been confirmed

by the United States Senate, the district court reasoned, the

magistrate judge lacked jurisdiction to certify

extraditability. See id. at ---, *5-*11. The district court 

denied the government's motion for reconsideration on January

13, 1997. This court then stayed the district court's order

and expedited the present appeal. 

 

3. Due to the limited function of an extradition proceeding,
there is no direct appeal from a judicial officer's
certification of extraditability. See Collins v. Miller, 252 
U.S. 364, 369-70 (1920). A habeas petition is therefore the
only mechanism by which a relator may seek review.

-9- 9

At the time Lui was arrested in Boston in December

1995, more than eighteen months remained before the reversion

of Hong Kong to the PRC on July 1, 1997. The various

proceedings in our court system have now occupied fifteen of

those months, as the magistrate judge and district judge have

given careful consideration to the issues.

II.

The extradition request was made pursuant to the

Extradition Treaty Between the Government of the United

States of America and the Government of the United Kingdom of

Great Britain and Northern Ireland, June 8, 1972, 28 U.S.T.

227 (the "Treaty"), as amended by the Supplementary Treaty

Between the Government of the United States of America and

the Government of the United Kingdom of Great Britain and

Northern Ireland, June 25, 1985, T.I.A.S. No. 12050 (the

"Supplementary Treaty").4 The original Treaty was made

applicable to Hong Kong, among other British territories, by

an exchange of diplomatic notes on October 21, 1976. 28

U.S.T. at 238-41.5 The Supplementary Treaty is applicable to

 

4. We refer to the Treaty and the Supplementary Treaty as
"the Treaties."

5. By its terms, the Treaty applies to the UK, and, in
addition, to "any territory for the international relations
of which the United Kingdom is responsible and to which the
Treaty shall have been extended by agreement between the
Contracting Parties embodied in an Exchange of Notes." 
Treaty, art. II(1)(a). 
The Treaty permits either the UK or the United States,
upon six months written notice, to terminate the application

-10- 10

Hong Kong by its terms. Supplementary Treaty, art. 6(a) &

Annex.

Hong Kong's status as a Crown Colony is coming to

an end on July 1, 1997, when Hong Kong is to be restored to

the PRC. The impending reversion, at the expiration of the

UK's ninety-nine year leasehold, was formally agreed upon by

the UK and the PRC in 1984; the United States was not a party

to this agreement. See Joint Declaration of the Government 

of the United Kingdom of Great Britain and Northern Ireland

and the Government of the People's Republic of China on the

Question of Hong Kong, Dec. 19, 1984, ratified and entered

into force May 27, 1985, T.S. No. 26 (1985) (the "Joint

Declaration"). Under the terms of the Joint Declaration, the

PRC "declares" its "basic policies" with respect to Hong

Kong. Id. art. 3. The PRC states that it intends to 

establish a "Hong Kong Special Administrative Region"

("HKSAR"), id. art. 3(1), which will enjoy a "high degree of 

autonomy except in foreign and defence affairs." Id. art. 

3(2). In addition, the PRC states that the HKSAR "will be

vested with . . . independent judicial power, including that

of final adjudication" and that the "laws currently in force

in Hong Kong will remain basically unchanged." Id. art. 

 

of the Treaty as to any territory to which the Treaty was
extended under article II(1)(a). Id. art II(2). To date, to 
our knowledge, neither party has attempted to invoke this
provision to terminate the application of the Treaty to Hong
Kong.

-11- 11

3(3). These "basic policies" are, according to the Joint

Declaration, to "remain unchanged for 50 years." Id. art. 

3(12).

United States Senate ratification of the

Supplementary Treaty occurred on July 17, 1986, well after

the widely publicized signing of the Joint Declaration. See 

132 Cong. Rec. 16,819 (1986). Clearly, the Senate was aware

of the planned reversion when it approved the applicability

to Hong Kong of the Supplementary Treaty.6 The Supplementary

Treaty does not contain an exception for relators who can

show that their trial or punishment will occur after the date

of reversion. Indeed, the Supplementary Treaty is entirely

silent on the question of reversion.

The United States does not have an extradition

treaty with the PRC. However, on December 20, 1996, the

United States signed an extradition treaty with the

government of the nascent HKSAR, which provides for

reciprocal post-reversion extradition. See Agreement Between 

the Government of the United States of America and the

Government of Hong Kong for the Surrender of Fugitive

Offenders, Dec. 20, 1996 (the "New Treaty"). The New Treaty

will not enter into force until the Senate gives its advice

 

6. See, e.g., 132 Cong. Rec. 16,598 (1986) (statement of 
Sen. Hatch) (commenting on applicability of Supplementary
Treaty to Hong Kong).

-12- 12

and consent. It was submitted to the Senate on March 3,

1997. See 143 Cong. Rec. S1846 (daily ed. Mar. 3, 1997). 

A. United States Extradition Procedure  

In the United States, the procedures for

extradition are governed by statute. See 18 U.S.C. ch. 209. 

The statute establishes a two-step procedure which divides

responsibility for extradition between a judicial officer7

and the Secretary of State. The judicial officer's duties

are set out in 18 U.S.C. 3184. In brief, the judicial

officer, upon complaint, issues an arrest warrant for an

individual sought for extradition, provided that there is an

extradition treaty between the United States and the relevant

foreign government and that the crime charged is covered by

the treaty. See id. If a warrant issues, the judicial 

officer then conducts a hearing to determine if "he deems the

evidence sufficient to sustain the charge under the

provisions of the proper treaty." Id. If the judicial 

officer makes such a determination, he "shall certify" to the 

Secretary of State that a warrant for the surrender of the

relator "may issue." Id. (emphases added). The judicial 

officer is also directed to provide the Secretary of State

with a copy of the testimony and evidence from the

extradition hearing. Id.  

 

7. The judicial officer may be any federal judge, any
authorized magistrate, or any state judge of a court of
general jurisdiction. See id. 3184. 

-13- 13

It is then within the Secretary of State's sole 

discretion to determine whether or not the relator should

actually be extradited. See 18 U.S.C. 3186 ("The Secretary 

of State may order the person committed under section[] 

3184 . . . of this title to be delivered to any authorized

agent of such foreign government . . . .") (emphasis added).

The Secretary has the authority to review the judicial

officer's findings of fact and conclusions of law de novo,8 

and to reverse the judicial officer's certification of

extraditability if she believes that it was made

erroneously.9 See 4 Abbell & Ristau, International Judicial 

Assistance: Criminal - Extradition 13-3-8(2), at 266-69 

(1995); Note, Executive Discretion in Extradition, 62 Colum. 

L. Rev. 1313, 1316-25 (1962). The Secretary may also decline

to surrender the relator on any number of discretionary

grounds, including but not limited to, humanitarian and

 

8. While not required to by statute, the Department of
State routinely accepts written submissions from relators in
conjunction with its review of extraditability. 4 Abbell &
Ristau, International Judicial Assistance: Criminal -- 
Extradition, 13-3-8(5), at 274 (1995). 

9. Although at first glance, this procedure might appear to
be of questionable constitutionality because it subjects
judicial decisions to executive review, rendering them non-
final, cf. Hayburn's Case, 2 U.S. (2 Dall.) 409 (1792), it 
has been held that the judicial officer in an extradition
proceeding "is not exercising 'any part of the judicial power
of the United States,'" and instead is acting in "a non-
institutional capacity." United States v. Howard, 996 F.2d 
1320, 1325 (1st Cir. 1993) (quoting In re Kaine, 55 U.S. (14 
How.) 103, 120 (1852)).

-14- 14

foreign policy considerations. See 4 Abbell & Ristau, supra, 

13-3-8(3), at 269-73; II Bassiouni, International 

Extradition: United States Law and Practice 601-04 (1987). 

Additionally, the Secretary may attach conditions to the

surrender of the relator. See Jimenez v. United States 

District Court, 84 S. Ct. 14, 19 (1963) (Goldberg, J., 

chambers opinion) (denial of stay) (describing commitments

made by Venezuelan government to United States Department of

State as a condition of surrender of fugitive); 4 Abbell &

Ristau, supra, 13-3-8(4), at 273-74; II Bassiouni, supra, 

at 604.10 The State Department alone, and not the judiciary,

has the power to attach conditions to an order of

extradition. See, e.g., Emami v. United States District 

Court, 834 F.2d 1444, 1453 (9th Cir. 1987); Demjanjuk v. 

Petrovsky, 776 F.2d 571, 584 (6th Cir. 1985). Of course, the 

Secretary may also elect to use diplomatic methods to obtain

fair treatment for the relator. See, Note, supra, at 1325- 

26; cf. In re Normano, 7 F. Supp. 329, 329 (D. Mass. 1934). 

Thus, under 18 U.S.C. 3184, the judicial

officer's inquiry is limited to a narrow set of issues

concerning the existence of a treaty, the offense charged,

and the quantum of evidence offered. The larger assessment

 

10. The United States has, for example, imposed conditions
as to the type of trial the relator would receive (e.g., in 
civil, rather than martial law, court) and as to security
arrangements for the relator. 4 Abbell & Ristau, supra,  
13-3-8(4), at 273 n.1. 

-15- 15

of extradition and its consequences is committed to the

Secretary of State. This bifurcated procedure reflects

the fact that extradition proceedings contain legal issues

peculiarly suited for judicial resolution, such as questions

of the standard of proof, competence of evidence, and treaty

construction, yet simultaneously implicate questions of

foreign policy, which are better answered by the executive

branch. Both institutional competence rationales and our

constitutional structure, which places primary responsibility

for foreign affairs in the executive branch, see, e.g., 

United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 

319-22 (1936), support this division of labor. 

In implementing this system of split

responsibilities for extradition, courts have developed

principles which ensure, among other things, that the

judicial inquiry does not unnecessarily impinge upon

executive prerogative and expertise. For example, the

executive branch's construction of a treaty, although not

binding upon the courts, is entitled to great weight. Factor 

v. Laubenheimer, 290 U.S. 276, 295 (1933); cf. United States 

v. Howard, 996 F.2d 1320, 1330 n.6 (1st Cir. 1993) (deference 

to executive in extradition context stems, at least in part,

from fact that executive wrote and negotiated operative

documents). Another principle is that extradition treaties,

unlike criminal statutes, are to be construed liberally in

-16- 16

favor of enforcement because they are "in the interest of

justice and friendly international relationships." Factor, 

290 U.S. at 298. These principles of construction require

courts to:

interpret extradition treaties to produce
reciprocity between, and expanded rights
on behalf of, the signatories:
"[Treaties] should be liberally construed
so as to effect the apparent intention of
the parties to secure equality and
reciprocity between them. For that
reason, if a treaty fairly admits of two
constructions, one restricting the rights
which may be claimed under it, and the
other enlarging it, the more liberal
construction is to be preferred."

Howard, 996 F.2d at 1330-31 (quoting Factor, 290 U.S. at 293- 

94).

Another principle that guides courts in matters

concerning extradition is the rule of non-inquiry. More than

just a principle of treaty construction, the rule of non-

inquiry tightly limits the appropriate scope of judicial

analysis in an extradition proceeding. Under the rule of

non-inquiry, courts refrain from "investigating the fairness

of a requesting nation's justice system," id. at 1329, and 

from inquiring "into the procedures or treatment which await

a surrendered fugitive in the requesting country."

Arnbjornsdottir-Mendler v. United States, 721 F.2d 679, 683 

(9th Cir. 1983). The rule of non-inquiry, like extradition

procedures generally, is shaped by concerns about

institutional competence and by notions of separation of

-17- 17

powers. See United States v. Smyth, 61 F.3d 711, 714 (9th 

Cir. 1995).11 It is not that questions about what awaits the

relator in the requesting country are irrelevant to

extradition; it is that there is another branch of

government, which has both final say and greater discretion

in these proceedings, to whom these questions are more

properly addressed.12

 

11. One commentator has analogized the rule of non-inquiry
to the "act of state" doctrine, which prohibits United States
courts from judging the governmental acts of a foreign
country performed within its own territory. See Semmelman, 
Federal Courts, The Constitution, and The Rule of Non-Inquiry 
in International Extradition Proceedings, 76 Cornell L. Rev. 
1198 (1991). The "act of state" doctrine, the Supreme Court
has said, "arises out of the basic relationships between
branches of government in a system of separation of powers. 
It concerns the competency of dissimilar institutions to make
and implement particular kinds of decisions in the area of
international relations." Banco Nacional de Cuba v. 
Sabbatino, 376 U.S. 398, 423 (1964). This court has doubted, 
in dicta, that the rule of non-inquiry is constitutionally
mandated. Howard, 996 F.2d at 1330 n.6. Whether the 
doctrine is constitutionally mandated is immaterial here.

12. Nor is it true, as Lui suggests, that the rule of non-
inquiry is only appropriate where the existence of a treaty
reflects a substantive judgment about the fairness of another
nation's procedures. The United States has maintained, over
time, extradition treaties with some of the world's most
oppressive and arbitrary regimes. See 18 U.S.C. 3181 
(listing treaties of extradition and dates entered into). 
The rule of non-inquiry expresses no judgment about a foreign 
nation's ability and willingness to provide justice; it
simply defers that assessment to the second part of every
extradition proceeding -- review of extraditability and
determination of the appropriateness of surrender by the
Secretary of State. Indeed, a leading commentator, in
discussing the scope of the Secretary's discretion under 18
U.S.C. 3186, has argued that it is precisely "because of 
the rule of non-inquiry" that it is appropriate for the
Secretary to exercise discretion on humanitarian grounds. II
Bassiouni, supra, at 602 (emphasis added). 

-18- 18

Lui contends that, on July 1, 1997, the reversion

of Hong Kong to the PRC will result in his being subjected to

trial and punishment by a regime with which the United States

has no extradition treaty. This future event, Lui argues,

operates retroactively to render his extradition illegal, as 

of today, because, he says, extradition is only legitimate 

where trial and punishment will be administered by the regime

with which the United States has a treaty. 

Although Lui is correct that the government has

conceded that he will not be tried before reversion, it is

also quite possible that the scenario he depicts will not

arise. The new extradition treaty with the HKSAR may be

approved by the United States Senate, establishing a

continuity of treaties through and beyond July 1, 1997.13

The United States government may choose to extend the current

Treaty by executive agreement.14 To the extent that Lui's

 

13. The government does not argue that, absent any other
action and of their own accord, the Treaties would continue
beyond reversion to apply to Hong Kong. Accordingly, on the
facts of this case, we find the discussion of the state
succession doctrine in Terlinden v. Ames, 184 U.S. 270 
(1902), a case heavily relied upon by the district court, see 
Lui Habeas, --- F. Supp. at ---, 1997 WL 37477, at *4-*5, to 
be of little assistance to Lui. Of course, the discussion in
Terlinden of the rule of non-inquiry is relevant, and 
supports our analysis.

14. It may be argued that this alternative infringes upon
the Senate's prerogative, under the Treaty Clause, U.S.
Const., art. II, 2, to give its advice and consent. But it
is hardly an appropriate judicial task to attempt to resolve
a hypothetical and not ripe dispute between the legislature
and the executive.

-19- 19

argument depends on the fairness of the procedures he will be

subjected to, he asks this court to decide that the PRC will

not adhere to the Joint Declaration with the UK, in which it

declared its intention to maintain Hong Kong's legal system

for fifty years.

All of these questions involve an evaluation of

contingent political events. The Supreme Court has said that

the indicia of a non-justiciable political question include: 

a textually demonstrable constitutional
commitment of the issue to a coordinate
political department; or a lack of
judicially discoverable and manageable
standards for resolving it; or the
impossibility of deciding without an
initial policy determination of a kind
clearly for nonjudicial discretion; or
the impossibility of a court's
undertaking independent resolution
without expressing lack of respect due
coordinate branches of government; or an
unusual need for unquestioning adherence
to a political decision already made; or
the potentiality of embarrassment from
multifarious pronouncements by various
departments on one question.

Baker v. Carr, 369 U.S. 186, 217 (1962). While not all of 

these ingredients are present here, several are. Moreover,

unlike many "political questions," whose resolution, absent

judicial determination, must await the vagaries of the

political process, here there is a statutory scheme which

provides for the resolution of these questions by an

identified member of the executive branch. The case for

-20- 20

judicial resolution is thus weaker than with many such

questions.

The principles of reciprocity and liberal

construction also counsel against construing the Treaties so

as to prohibit Lui's extradition. Hong Kong, through the

United Kingdom, has entered bilateral treaties with the

United States. The United States has sought extradition of

criminals from Hong Kong in the past, and may wish to

continue to do so up until July 1, 1997. If the executive

chooses to modify or abrogate the terms of the Treaties that

it negotiated, it has ample discretion to do so. However, if

this court were to read a cut-off date vis-a-vis extraditions

to Hong Kong into the Treaties, it would risk depriving both

parties of the benefit of their bargain.

None of these principles, including non-inquiry,

may be regarded as an absolute. We, like the Second Circuit,

"can imagine situations where the relator, upon extradition,

would be subject to procedures or punishment so antipathetic

to a federal court's sense of decency as to require

reexamination of the principle[s]" discussed above. Gallina 

v. Fraser, 278 F.2d 77, 79 (2d Cir. 1960). This is not such 

a case. Lui is wanted for economic, not political,

activities whose criminality is fully recognized in the

United States. His extradition is sought by the current Hong 

Kong regime, a colony of Great Britain, which, as Lui himself

-21- 21

points out, is one of this country's most trusted treaty

partners. Moreover, Lui has been a fugitive from Hong Kong

since 1994. He has been subject to extradition since

entering the United States in December 1995. That now only a

few months remain before the reversion of Hong Kong is partly

attributable to strategic choices made by Lui himself. There

is nothing here which shocks the conscience of this court.

B. The Treaties 

There is no dispute that the Treaty, as

supplemented by the Supplementary Treaty, is currently in

effect and is applicable to Hong Kong. The district court,

in granting Lui's habeas petition, reasoned that "the Treaty,

by its own terms, does not allow the extradition of a person

to Hong Kong if the Crown Colony of Hong Kong is unable to

try and to punish that person." Lui Habeas, --- F. Supp. at 

---, 1997 WL 37477, at *5. The government counters that the

terms of the Treaty clearly allow Lui's extradition. There

is nothing in the plain language of the Treaties that would

permit the construction made by the district court. The

principles discussed above argue persuasively against reading

judicially created limitations into the Treaties' unambiguous

text. 

1. Overview 

We begin our analysis of the Treaties with a brief

overview of the Treaties' operative provisions. Article I of

-22- 22

the Treaty states the basic reciprocal compact, providing

that:

Each Contracting Party undertakes to
extradite to the other, in the
circumstances and subject to the
conditions specified in this Treaty, any
person found in its territory who has
been accused or convicted of any offense
within Article III, committed within the
jurisdiction of the other Party.

Treaty, art. I.

Article III contains the "dual criminality"

requirement, a requirement that is "central to extradition

law and [one that] has been embodied either explicitly or

implicitly in all prior extradition treaties between the

United States and Great Britain." Brauch v. Raiche, 618 F.2d 

843, 847 (1st Cir. 1980). Article III, in relevant part,

provides that:

Extradition shall be granted for an
act or omission the facts of which
disclose an offense within any of the
descriptions listed in the Schedule
annexed to this Treaty . . . or any other
offense, if: (a) the offense is
punishable under the laws of both Parties
by imprisonment or other form of
detention for more than one year or by
the death penalty . . . .

Treaty, art. III(1). The annexed Schedule lists twenty-nine

general crimes, including bribery, the crime of which Lui is

accused. See Treaty, Schedule, No. 23.  

Article V contains various affirmative defenses,

including the "political offense" exception. As a general

-23- 23

matter, the political offense exception "is now a standard

clause in almost all extradition treaties of the world." I

Bassiouni, supra, at 384. The political offense exception in 

the Treaty prohibits extradition where "(i) the offense for

which extradition is requested is regarded by the requested

Party as one of a political character; or (ii) the person

sought proves that the request for his extradition has in

fact been made with a view to try or punish him for an

offense of a political character." Treaty, art. V(1)(c).

The Supplementary Treaty narrows the availability

of this political offense exception. It lists a range of

crimes -- all crimes of violence -- that may not be regarded

as political offenses for the purpose of raising the

political offense exception. See Supplementary Treaty, art. 

1. The Supplementary Treaty also offers an affirmative

defense to fugitives sought for crimes of violence who, by

virtue of its article 1, are unable to raise the political

offense exception. See Supplementary Treaty, art. 3(a), (b). 

Such a fugitive may block extradition by establishing:

by a preponderance of the evidence that
the request for extradition has in fact
been made with a view to try or punish
him on account of his race, religion,
nationality, or political opinions, or
that he would, if surrendered, be
prejudiced at his trial or punished,
detained or restricted in his personal
liberty by reason of his race, religion,
nationality or political opinions.

Id. art. 3(a). 

-24- 24

The procedural requisites of an extradition request

are specified in article VII of the Treaty. The request must

be accompanied by, inter alia, a description of the fugitive, 

a statement of facts of the offense, and the text of the law

under which he is charged. See Treaty, art. VII (2). For 

accused (as opposed to already convicted) fugitives, the

request must also include a valid arrest warrant and "such

evidence as, according to the law of the requested Party,

would justify his committal for trial if the offense had been

committed in the territory of the requested Party, including

evidence that the person requested is the person to whom the

warrant of arrest refers." Id. art. VII(3).15 

Article XII contains the "specialty" requirement, a

common feature of extradition treaties. Specialty has two

basic components. First, the requesting state may not try

the fugitive for any crimes other than the specific crime for

which extradition was sought and granted. Second, the

requesting state may not re-extradite the fugitive to a third

state. See Treaty, art. XII.  

2. Analysis 

Both the district court and Lui focus on four

Treaty provisions in concluding that the Treaty is

inapplicable to Lui. See Lui Habeas, --- F. Supp. at ---, 

 

15. Article IX(1), in turn, states that extradition shall
not be granted if the evidentiary showing required by article
VII(3) is not made by the requesting party.

-25- 25

1997 WL 37477, at *5-*7. We address these provisions in

turn, concluding that the obligation of the United States to

extradite Lui, specified in article I of the Treaty, is not

undermined by any of these provisions. We base our analysis

on the plain language of the Treaty. United States v. 

Alvarez-Machain, 504 U.S 655, 663 (1992); Sumitomo Shoji Am., 

Inc. v. Avagliano, 457 U.S. 176, 180 (1982). Underlying this 

analysis is the court's awareness of the limited role of the

judiciary in extradition proceedings. 

The Warrant Requirement  

The district court understood the warrant

requirement of article VII(3) to serve the purpose of

permitting "the requested sovereign to know that the relator

has been accused . . . pursuant to the laws of the requesting

sovereign, and that he will be tried and punished in

accordance with that sovereign's laws." Lui Habeas, --- F. 

Supp. at ---, 1997 WL 37477, at *6. In this case, the

district court reasoned, since Lui would not be tried in

accordance with the present Hong Kong regime's laws, the

warrant requirement was not met. Id.  

There is nothing in the language of article VII(3),

or the rest of article VII, which indicates that the warrant

requirement serves the greater function attributed to it by

the district court. Indeed, the warrant requirement appears

to do nothing more than to help the judicial officer in the

-26- 26

requested country to confirm that there are in fact charges

properly pending against the relator in the requested

country, and that the relator is actually the person sought.

It does not authorize the investigation which the district

court envisioned, and indeed such an investigation is

foreclosed by the rule of non-inquiry. A warrant was

provided by the Hong Kong authorities here, and Lui does not

attack its validity or authenticity. The warrant requirement

was plainly satisfied.

The Dual Criminality Requirement  

The district court understood the purpose of the

dual criminality requirement, as stated in article III of the

Treaty, to be "to provide the requested sovereign with the

opportunity to examine the substantive law of the requesting

sovereign in the context of the Treaty." Lui Habeas, --- F. 

Supp. at ---, 1997 WL 37477, at *6. The court stated that

the requirement serves to "underscore[] the expectation

running through the Treaty that [Lui] is to be tried, judged,

and punished in accordance with the laws of the requesting

sovereign." Id. 

There is nothing in the text of article III of the

Treaty that supports this sweeping conclusion. The dual

criminality requirement, by its plain terms, is satisfied if

the crime of which the relator is accused appears on the

annexed Schedule or is punishable in both countries by at

-27- 27

least one year's imprisonment. Bribery, as noted above,

appears on the annexed Schedule. 

The purpose of the dual criminality requirement is

simply to ensure that extradition is granted only for crimes

that are regarded as serious in both countries. See United 

States v. Saccoccia, 58 F.3d 754, 766 (1st Cir. 1995) ("The 

principle of dual criminality dictates that, as a general

rule, an extraditable offense must be a serious crime (rather

than a mere peccadillo) punishable under the criminal laws of

both the surrendering and the requesting state.");

Restatement (Third) of the Foreign Relations Law of the 

United States 476, cmt. d (1987); id. 475, cmt. c. 

The dual criminality requirement is satisfied here.

The Political Offense Exception  

The district court also relied on article 3(a) of

the Supplementary Treaty, which, it stated, requires the

judicial officer "to examine the reasons for the requesting

sovereign's desire to try and to punish the relator." Lui 

Habeas, --- F. Supp. at ---, 1997 WL 37477, at *6. In this 

case, stated the district court, article 3(a) "underscores

again the Treaty's requirement and expectation that

extradition . . . may not take place if the requesting

sovereign . . . is unable to try and punish Lui in the

relatively few days left before its reversion to China." Id. 

-28- 28

The Supplementary Treaty article 3(a) defense is

simply inapplicable here. Supplementary Treaty article 3(a)

describes a defense which is available only to fugitives

charged with one of the crimes specified in article 1 of the

Supplementary Treaty, all of which are crimes of violence.

Lui's alleged crime -- bribery -- is not among the crimes

enumerated in the Supplementary Treaty's article 1.

Indeed, the very purpose of the Supplementary

Treaty was to cabin the political offense exception so that

perpetrators of certain violent offenses would be precluded

from avoiding extradition simply because their criminal

activity was inspired by political motivation. See Howard, 

996 F.2d at 1324-25. Because this contraction of the time-

honored political offense exception stirred up a great deal

of controversy during negotiations, a compromise position was

ultimately agreed upon, so that fugitives barred from

invoking the political offense defense might still claim the

protection of the more limited defense of article 3(a). See 

id. at 1324 (discussing negotiating history and legislative 

history). 

Lui properly does not claim that he is entitled to

the article V(1)(c) political offense exception.16 The

 

16. Even if he had attempted to assert the political offense
exception, he would likely have been unsuccessful since
"[c]riminal conduct in the nature of financial
fraud . . . traditionally has been considered outside the
'political offense' exception." Koskotas v. Roche, 931 F.2d 

-29- 29

Supplementary Treaty article 3(a) defense was unavailable to

him, and thus, however much article 3(a) might ever, as the

district court stated, "require[] the court to examine the

reasons for the requesting sovereign's desire to try and to

punish the relator," Lui Habeas, --- F. Supp. at ---, 1997 WL 

37477, at *6, it certainly does not do so here.

Moreover, article 3(a) allows the judicial officer

to make only a narrowly circumscribed inquiry. "[A]n

extradition target must establish by a preponderance of the

evidence that, if he were surrendered, the legal system of

the requesting country would treat him differently from other

similarly situated individuals because of his race, religion,

nationality, or political opinions." Howard, 996 F.2d at 

1331. Lui made no such showing of discrimination, and the

district court, in making its own predictions about the post-

reversion justice system in Hong Kong, exceeded the narrow

inquiry permitted by article 3(a). 

The Rule of Specialty 

The district court understood the Treaty's

specialty provision to signify that "the Treaty allows only

for extradition for offenses that can be tried and punished

by the requesting sovereign." Lui Habeas, --- F. Supp. at -- 

-, 1997 WL 37477, at *6-*7. Because the specialty obligation

cannot be enforced by the United States after reversion,

 

169, 172 (1st Cir. 1991) (citing cases).

-30- 30

reasoned the district court, article XII is violated ab 

initio, and Lui cannot be extradited. Id. at *7. 

The rule of specialty literally has no application

here. The rule has two basic requirements: that the relator

be tried for the crimes charged in the extradition warrant

and that the relator not be re-extradited to another country.

There is no claim that either of these is violated. Indeed,

as the district court properly recognized, Lui is not arguing

that the reversion itself would constitute a de facto re-

extradition from Hong Kong to China in violation of the

specialty provision. Lui Habeas, --- F. Supp. at ---, 1997 

WL 37477, at *12 n.15; see also Oen Yin-Choy v. Robinson, 858 

F.2d 1400, 1403-04 (9th Cir. 1988).

The essence of Lui's argument is rather different:

it is that the fact that he cannot be tried and punished by

the same government which gave the Treaty assurances

contravenes the rationale behind the specialty provisions and

so undermines confidence that this is the result the Senate

intended in giving its consent. The responses to that

argument are largely those outlined at the beginning of this

opinion. We add only our thoughts directed to the specialty

clause itself.

If Lui's position were correct, the enforceability

of many extradition treaties to which the United States is a

party would be thrown into grave doubt. Regimes come and go,

-31- 31

as, indeed, do states. Moreover, 18 U.S.C. 3184, which

defines the role of the courts in the extradition process,

gives no discretion to the judicial officer to refuse to

certify extraditability on the ground that a treaty partner

cannot assure the requested country that rights under a

treaty will be enforced or protected. See Saccocia, 58 F.3d 

at 766-67.

The Ninth Circuit, writing in 1988, also rejected a

similar argument made by a fugitive who fought extradition by

arguing that the United States would be unable to compel Hong

Kong's compliance with the specialty obligation because,

although he would face trial in the Crown Colony, his

imprisonment might extend past the reversion date. "Were the

Treaty to be interpreted as [the fugitive] asks, extradition

to Hong Kong would be the exception rather than the rule

because it would be limited in practice only to extraditions

for crimes which could be punished for a term expiring before

the reversion date." Oen Yin-Choy, 858 F.2d at 1404. 

Indeed, if we interpreted the specialty provision in this

way, we would be forced to conclude that any relator

extradited from the United States to Hong Kong at any point

since the signing of the Joint Declaration, was, if he faced

a term of imprisonment upon conviction that could conceivably

extend past the date of reversion, sent to Hong Kong in

violation of the Treaty.

-32- 32

Of course, Lui may express his concerns about the

post-reversion enforceability of specialty to the Secretary

of State, who, in her discretion, may choose not to surrender

him. We note that the newly signed, as yet unratified,

extradition treaty between the United States and the HKSAR

provides that specialty protection "shall apply to fugitive

offenders who have been surrendered between the parties prior

to the entry into force" of the new treaty. New Treaty,

arts. 16, 20. It is not the role of the judiciary to

speculate about the future ability of the United States to

enforce treaty obligations.

III.

Lui also challenges the determination of the

magistrate judge that there was probable cause to believe

that Lui had violated Hong Kong law on eight of the nine

charges in the warrant. Although the district court declined

to review this issue, we do reach it.

Lui protests that we lack power to reach this

issue, and that we must remand to the district court for

further findings. However, the issue was fully briefed and

argued to the district court. The record is complete. This

is a habeas corpus appeal, in which the district court was

not the fact finder but had only a review function over the

findings made by the magistrate judge. The function to be

exercised by the district court is more akin to appellate

-33- 33

review, and is done on the same record as is before us.

Under these circumstances, the district court had no greater

institutional competence to perform this review task than do

we. That the district court declined to reach the issue does

not deprive us of the power to do so. 

While it is true that, as a general matter, federal

courts of appeals do not rule on issues not decided in the

district court, Singleton v. Wulff, 428 U.S. 106, 120 

(1976), we do have discretion to address issues not reached

by the district court when the question is essentially legal

and the record is complete. Quinn v. Robinson, 783 F.2d 776, 

814 (9th Cir. 1986); cf. Howard, 996 F.2d at 1329 ("That the 

district court failed to afford plenary review on this aspect

of the case does not mean that we must remand . . . .

Rather, because the question is quintessentially legal and

this court is fully capable of deciding it without any

further development of the record, we can simply address and

resolve it.") (citations omitted). Such is the case here.

We have before us the parties' memoranda on probable cause to

the district court and the magistrate judge as well as the

completed evidentiary record. In the interest of conserving

judicial resources and mindful of the policy that extradition

matters be handled expeditiously, we see no reason for

-34- 34

further delay.17 Cf. Fernandez v. Phillips, 268 U.S. 311, 

312 (1925) (Supreme Court reviews probable cause

determination of judge certifying extradition without

intermediate court passing on the question).

The traditional formulation is that, on habeas

corpus review of a certification of extraditability, the

court only examines the magistrate judge's determination of

probable cause to see if there is "any evidence" to support

it. Fernandez, 268 U.S. at 312; see also Sidali v. INS, --- 

F.3d ---, ---, 1997 WL 74506, *9 (3d Cir. 1997); Then v. 

Melendez, 92 F.3d 851, 854 (9th Cir. 1996). This circuit has 

interpreted the "any evidence" standard quite literally,

conducting a fairly deferential review of the magistrate's

findings. See Koskotas v. Roche, 931 F.2d 169, 176 (1st Cir. 

1991); United States v. Manzi, 888 F.2d 204, 205 (1st Cir. 

1989); Brauch, 618 F.2d at 854; Greci v. Birknes, 527 F.2d 

956 (1st Cir. 1976).

Recently, some other appellate courts, while

retaining the traditional formulation, have apparently

 

17. There is no unfairness to Lui. He has had full
opportunity to address the issue of whether there is probable
cause for extradition before the magistrate judge and full
opportunity to address the magistrate judge's determination
before the district court. In the extradition proceedings
before the magistrate judge, Lui filed a 45 page memorandum
on the probable cause issue accompanied by a copious
appendix. He also filed motions to exclude certain of the
government's evidence, called witnesses, and presented both
live testimony and testimony by affidavit.

-35- 35

engaged in a more rigorous review of the evidence presented

before the judicial officer, thus raising questions about the

actual content of the "any evidence" standard. See, e.g., 

Sidali, --- F.3d at ---, 1997 WL 74506, at *9; Ludecke v. 

Marshal, 15 F.3d 496, 497-98 (5th Cir. 1994); Peters v. 

Egnor, 888 F.2d 713, 717-18 (10th Cir. 1989). The Supreme 

Court last addressed the scope of a court's authority on

habeas corpus review of a finding of extraditability in 1925,

when it said that "the alleged fugitive from justice has had

his hearing" and that "habeas corpus is available only to

inquire" into a very limited list of issues. See Fernandez, 

268 U.S. at 312. The existence of "any evidence warranting

the finding that there was reasonable ground to believe the

accused guilty" was one of only three issues that the

Fernandez court said might permissibly be reached on habeas. 

Id. At that time, the scope of habeas corpus review of all 

proceedings was very limited, and Fernandez's strictures on 

review in extradition proceedings, including the deferential

"any evidence" standard, may simply reflect that generally

narrower view of the writ. See In re Extradition of Burt, 

737 F.2d 1477, 1484 (7th Cir. 1984) ("[T]he broad language of

Fernandez, which on its face would appear to restrict the 

scope of inquiry here, must be construed 'in the context of

its time and in the context of subsequent development of the

scope of habeas corpus review.'" (citation omitted)). Since

-36- 36

1925, and until the enactment of the AEDPA in 1996,18 habeas

corpus in other contexts has expanded to become a "second

look" at most substantive and procedural issues. Similarly,

courts reviewing certifications of extraditability, while

continuing to cite Fernandez, have actually engaged in review 

of issues beyond those enumerated by the Supreme Court in

1925. See Kester, Some Myths of United States Extradition 

Law, 76 Geo. L.J. 1441, 1473 (1988); see also 4 Abbell & 

Ristau, supra, 13-3-6, at 255-57. Thus, it is arguable 

that the "any evidence" standard is an anachronism, and that

this court should engage in a more searching review of the

magistrate's probable cause findings.

There is no reason to predict a resolution of this

issue here. Whatever the prism through which this record is

reviewed, ranging from a strictly construed "any evidence"

standard to de novo review, our conclusion is that the 

government has met its burden.

The purpose of the evidentiary portion of the

extradition hearing is to determine whether the United

States, on behalf of the requesting government, has produced

sufficient evidence to hold the person for trial. The

standard of sufficiency is derived from United States law,

including the Treaty between the United States and the UK.

 

18. Antiterrorism and Effective Death Penalty Act
("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996)

-37- 37

Under 18 U.S.C. 3184, the judicial officer must determine

whether the evidence of criminality is "sufficient to sustain

the charge under the provisions of the proper treaty or

convention." The Treaty requires that:

Extradition shall be granted only if
the evidence be found sufficient
according to the law of the requested
Party . . . to justify the committal for
trial of the person sought if the offense
of which he is accused had been committed
in the territory of the requested Party .
. . .

Treaty, art. IX(1). "United States courts have interpreted

this provision in similar treaties as requiring a showing by

the requesting party that there is probable cause to believe

that the accused has committed the charged offense." Quinn, 

783 F.2d at 783 (separate opinion of Reinhardt, J.) (citing

cases). The Supplementary Treaty defines probable cause:

Probable cause means whether there
is sufficient evidence to warrant a man
of reasonable caution in the belief
that . . . an offense has been committed
by the accused.

Supplementary Treaty, art. 2. The actual trial, if any, is

in the foreign court, and it is not the purpose of the

extradition hearing to determine whether the evidence is

sufficient to justify conviction. Thus it is the probable

cause determination which is subject to our review.

There is no dispute that payments of over HK $21

million (approximately US $3 million) and unsecured loans of

HK $10 million (approximately US $1.4 million) were made to

-38- 38

Lui, that the payments were made into foreign bank accounts

in Lui's name, and that the payments were not made directly

by check but through a series of steps which made them more

difficult to trace. There is also no dispute that the

payments were made on the dates charged. The timing is

significant. The payments coincided with the knowledge that

Lui was being considered as Director of Exports for BAT-HK

and with his appointment to that position in 1992.19 The

loans were made within three days of Lui's leaving his

employment at Brown & Williamson and BAT-HK. It is not

contested that BAT-HK was the major supplier of cigarettes to

GIL and WWC, that Brown & Williamson prohibits its employees

from accepting "inducements" from those with whom it does

business and requires disclosure statements to be completed,

and that Lui failed to disclose any of these payments on his

disclosure form. The dispute between the government and Lui

is basically over the purpose of these payments.

Two competing theories explaining the purpose of

the payments were presented to the magistrate judge. The

government argued that the payments were bribes. Although

Lui had no burden to produce any evidence at all and the

burden of showing probable cause rested entirely on the

government, Lui did present an explanation for the loans and

 

19. The one exception to this was the October 1988 payment
alleged in Count II, as to which the magistrate judge found a
lack of probable cause.

-39- 39

payments, primarily in the affidavit of Hung Wing Wah

("Hung"), a former GIL director and sole proprietor of GIL's

subsidiary, WWC.20 In essence, Hung said that, in or around

1987, prior to Lui's employment with Brown & Williamson, he

and Lui first began discussing "cigarette business matters."

Hung stated that these discussions eventually led to the

establishment of a profitable business relationship in which

Hung purchased Japanese cigarettes and resold them at a

profit for the account of Chen Ying-Jen ("Chen"), a former

GIL principal. The payments to Lui's foreign bank accounts

were filtered through Chen's account.

Hung stated he was told by Chen that, because of

the substantial profits generated by the business

relationship Lui had been instrumental in establishing, Chen

had agreed to pay Lui for his assistance and would continue

paying Lui as long as the relationship continued to generate

such substantial profits. Hung indicated that the sums paid

to Lui bore a reasonable relationship to the magnitude of

Chen's profits. And finally, Hung stated that the unsecured

short term loans had been made to Lui so that Lui could

invest in the then-booming Hong Kong stock market. Hung

 

20. Lui chose not to testify on his own behalf, as was his
prerogative. The magistrate judge properly excluded the
polygraph evidence offered by Lui to corroborate his
testimony. The polygraph evidence was not relevant, there
being no such testimony in evidence to corroborate. Whether
it would be admissible if he did testify, we do not address.

-40- 40

stated that both the principal and interest were repaid

shortly after the loans were made. During the hearing before

the magistrate judge, Lui's counsel indicated that Lui would

testify, and described what that testimony would be. This

description matched the testimony given by Hung. Lui

ultimately declined to testify.

Lui argued that the government's evidence was

insufficient to support an inference of bribery and that

there was, in any event, an innocent explanation. The

government argued that the undisputed facts were sufficient

to establish probable cause, and that the explanation was

inherently implausible. In addition, the government argued,

it had two "smoking gun" statements directly saying the

payments were bribes. We return to these two statements and

Lui's attack on them later.

The magistrate judge concluded that the explanation

proffered by Lui's counsel -- "to the effect that the

payments represented a gratuitous gesture of gratitude by one

of GIL's former principals for Lui's assistance in

introducing him to a supplier of Japanese cigarettes in 1987,

some six years before the last payments were made" -- was

inherently implausible. Lui Extradition, 939 F. Supp. at 

955.21 The implausibility of the explanation does give

 

21. The statement in the magistrate's opinion that Lui
adduced only counsel's argument and not explanatory evidence,
Lui Extradition, 939 F. Supp. at 955, is obviously an 

-41- 41

credence to the government's theory. See United States v. 

Burgos, 94 F.3d 849, 867 (4th Cir. 1996) (implausible tales 

to the finder of fact can rationally be viewed as

circumstantial evidence of guilt). Without consideration of

the two "smoking gun" statements, the magistrate judge was

fully warranted in finding probable cause.

In addition, the two statements, which Lui argues

were inadmissible, were properly admitted at the probable

cause stage of the extradition hearing and further support a

finding of probable cause.

The first statement was given to Hong Kong

investigators in July 1994 by Chui, one of Lui's alleged co-

conspirators. Chui was one of the principals of GIL until

April 1993. In his statement, Chui implicated himself and

other principals of GIL in a scheme to bribe Lui and others

to secure favorable allocations of cigarettes from BAT-HK.

According to Chui, GIL began paying bribes to Lui when they

first anticipated that Lui might eventually become an

important BAT-HK decisionmaker. Chui was murdered in

Singapore nine months after giving this statement.

The second statement was made by Francis McNamara

Haddon-Cave, who worked with Chui. Haddon-Cave testified in

Hong Kong in October 1995 at a hearing to determine the

 

oversight. Among other items, the Hung Wing Wah affidavit
was admitted into evidence and considered by the magistrate
judge.

-42- 42

sufficiency of the evidence to commit one of Lui's alleged

co-conspirators for trial on a charge of conspiracy to bribe

Lui. Haddon-Cave testified that he was hired by Chui to work

as a consultant for GIL and began working there in October

1992. One of Haddon-Cave's responsibilities was to foster

relationships between GIL and major suppliers like BAT-HK.

Haddon-Cave testified that Chui told him in Lui's presence

that Lui was "our man" and an important link with GIL. Lui,

then BAT-HK's Director of Exports, did not deny it. Haddon-

Cave further testified that later, outside of Lui's presence,

Chui told him that Lui was "on the take" and had become

wealthy as a result of the payments that distributors made to

him to secure favorable allocations of cigarettes. 

The framework for determining admissibility of

evidence here is determined by the Treaty itself and by

United States legal rules governing admissibility in

extradition proceedings. Pursuant to federal statute,

documents offered as evidence in an extradition hearing:

shall be received and admitted as
evidence . . . for all the purposes of
such hearing if they shall be properly
and legally authenticated so as to
entitle them to be received for similar
purposes by the tribunals of the foreign
country from which the accused party
shall have escaped . . . .

-43- 43

18 U.S.C. 3190.22 Proof of such authentication is the

certificate of the principal diplomatic or consular officer

of the United States resident in such foreign country. Id. 

Additionally, article VII(5) of the Treaty provides that any

evidence given upon oath or affirmation "shall be received in

evidence in any proceedings for extradition" if it is duly

authenticated. Treaty, art. VII(5). Both the Haddon-Cave

testimony and the Chui statement meet this authenticity

requirement and were thus admissible at the extradition

hearing by the terms of the relevant statute and treaties.

Lui argues nonetheless that the two statements were

improperly admitted because they would be inadmissible at

trial under Hong Kong law. Lui argues that it is inherently

unfair to certify that he is extraditable on the basis of

evidence that would be inadmissible in the court where he

would face trial. He also argues that failure to consider

the Hong Kong High Court's declaratory judgment (later

reversed) that the Chui statement would be inadmissible would

evince great disrespect for the judicial system of Hong Kong.

Both of these arguments are misplaced.

 

22. Lui does not rely on the language of 18 U.S.C. 3190. 
Most courts reviewing the language have concluded that 3190
requires only that the evidence meet any authentication
requirement imposed by a foreign tribunal, not that it be
admissible, much less that it be admissible at trial. See 
Oen Yin-Choy, 858 F.2d at 1406; Lui Extradition, 939 F. Supp. 
at 934 (citing cases).

-44- 44

In probable cause hearings under American law, the

evidence taken need not meet the standards for admissibility

at trial. Indeed, at a preliminary hearing in federal court

a "finding of probable cause may be based upon hearsay in

whole or in part." Fed. R. Crim. P. 5.1(a). This is because

a "preliminary hearing is not a minitrial of the issue of

guilt," Coleman v. Burnett, 477 F.2d 1187, 1201 (D.C. Cir. 

1973); rather, "its function is the more limited one of

determining whether probable cause exists to hold the accused

for trial." Barber v. Page, 390 U.S. 719, 725 (1968). An 

extradition hearing similarly involves a preliminary

examination of the evidence and is not a trial. Charlton v. 

Kelly, 229 U.S. 447, 461 (1913); Romeo v. Roache, 820 F.2d 

540, 544 (1st Cir. 1987). An extradition hearing does not

require a higher standard of evidence than a probable cause

hearing. The special and limited nature of extradition

hearings is manifested in a more lenient standard for

admissibility of evidence. Neither the Federal Rules of

Criminal Procedure, see Fed. R. Crim. P. 54(b)(5), nor the 

Federal Rules of Evidence, see Fed. R. Evid. 1101(d)(3), 

apply to extradition hearings. The evidence may coU.S. 309,

317 (1922). So American domestic law has already resolved

against Lui any claim that there is a violation of

Constitutional rights from the admission of hearsay evidence

-45- 45

at a probable cause hearing which would not be admitted at

trial.

Under Hong Kong law, the Haddon-Cave statement and

the Chui statement present separate and distinct issues. The

Haddon-Cave statement was ruled inadmissible at the Hong Kong

trial of Chong Tsoi-Jun ("Chong"), an alleged co-conspirator,

on an objection that it was not made in furtherance of the

conspiracy.

As to the Chui statement, a Hong Kong High Court

judge issued a declaration that the statement was

inadmissible hearsay. On appeal, the Hong Kong Court of

Appeal vacated this ruling, finding that Lui's request for a

declaratory judgment was not justiciable in the Hong Kong

courts, but that even if it were, the judge's grant of the

declaration would be an abuse of discretion. The Court of

Appeal reasoned that the issue of the admissibility of the

Chui statement in the extradition proceeding was a matter for

the United States court to decide. The court noted, however,

that the parties agreed that the statement was inadmissible

hearsay under Hong Kong law. In light of the Hong Kong

court's statement that the admissibility of the Chui

statement in the extradition hearing is a matter for the

United States court to decide, admission of the statement

into evidence cannot be viewed as a sign of disrespect for a

sister court.

-46- 46

The focus on admissibility is, we think, misplaced,

both based on these facts and on larger, institutional

concerns about the operation of habeas corpus in extradition

certifications. While in Manzi we "recognized that serious 

due process concerns may merit review beyond the narrow scope

of inquiry in extradition proceedings," there is no serious

due process issue here. See Manzi, 888 F.2d at 206; see also 

Koskotas, 931 F.2d at 174; cf. Burt, 737 F.2d at 1481; 

Gallina, 278 F.2d at 78. Lui's liberty interests are 

protected by the very existence of "an unbiased hearing

before an independent judiciary." In re Kaine, 55 U.S. (14 

How.) 103 (1852). 

Inherent in the probable cause standard is the

necessity of a determination that the evidence is both

sufficiently reliable and of sufficient weight to warrant the

conclusion. The probable cause standard does not even

require that the government make its showing by a

preponderance of the evidence. But neither is it toothless.

All evidence does not have the same importance even if it is

authentic and admissible. For example, a confession obtained

by duress is inherently unreliable and would be given little

weight even if the confession were authenticated. See Gill 

v. Imundi, 747 F. Supp. 1028, 1042-47 (S.D.N.Y. 1990). The 

reliability of the evidence is a factor for the reviewing

court to consider as well, and potentially unreliable

-47- 47

evidence may be accorded reduced weight by the court.

Restatement, supra, 478. 

No such concerns about reliability are implicated

here. First, the statements themselves were neither

involuntary nor obtained under questionable circumstances.

Further, the Hong Kong courts did not rule that either

statement was untrue or otherwise cast doubt on the

statements' credibility. Each statement was thought

inadmissible in Hong Kong on grounds pertaining to hearsay.

The Haddon-Cave statement was deemed inadmissible because it

did not meet one of the requirements for admissibility of a

co-conspirator's statement. The Chui statement was thought

inadmissible because the declarant was dead. The Hong Kong

government alleges that Chui was involved in the conspiracy

until he became a government informant and witness and that

he was murdered in order to prevent him from testifying. GIL

directors, including Hung and Chong, allegedly tried to

dissuade Chui from cooperating with the ICAC. We need not

reach the issue of whether the statement of a declarant,

murdered to keep him from testifying, might be admissible at

a criminal trial in the United States, cf. United States v. 

Houlihan, 92 F.3d 1271 (1st Cir. 1996), whatever the 

consequence of these facts under Hong Kong law.

Nevertheless, we note that the Chui statement might well be

admissible under United States law as a statement against

-48- 48

interest. See Fed. R. Evid. 804(b)(3). The magistrate judge 

correctly ruled that the two statements were not unreliable.

One final argument need not detain us long. Lui

argues, from his counsel's tactical decision not to present

his testimony at the extradition hearing, that he was

precluded from testifying. He argues that the magistrate

judge drew an unfavorable inference, in violation of his

Fifth Amendment rights, from his failure to testify. The

argument misapprehends what happened. The magistrate judge

did no such thing. Lui presented testimony from Hung and

five other affiants, as well as argument of counsel

attempting to explain the payments and loans. The magistrate

judge disbelieved the explanation, as it was within his

discretion to do. There is nothing in this objection.

For these reasons we reverse the grant of habeas

corpus by the district court. We continue in effect the

requirement that Lui be held without bail. If Lui wishes to

file a petition for rehearing and/or a petition for rehearing

en banc with this court, he must do so within 14 calendar

days. See Fed. R. App. P. 40(a) & 35(c). We stay, in any 

event, delivery of the certification of extraditability to

the Secretary of State during this 14 calendar day period to

permit Lui to seek relief from the United States Supreme

Court.

So ordered.

-49- 49